294 F.2d 217
 GREAT LAKES AIRLINES, INC., et al., Petitioners,
v.
CIVIL AERONAUTICS BOARD, Respondent,
Common Carrier Railroads, Intervenor, Trans World Airlines, Inc., Intervenor, United Air Lines, Inc., Intervenor.
CENTRAL AIR TRANSPORT, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent,
United Air Lines, Inc., Intervenor, Trans World Airlines, Inc., Intervenor, The Atchison, Topeka and Santa Fe Railway Company, et al., Common Carrier Railroads, Intervenors.
AIR TRANSPORT ASSOCIATES, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent,
Trans World Airlines, Inc., Intervenor, The Atchison, Topeka and Santa Fe Railway Company, et al., Intervenors.
CONTINENTAL CHARTERS, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent,
Trans World Airlines, Inc., Intervenor, The Atchison, Topeka and Santa Fe Railway Company, et al., Intervenors.
AIR CARGO EXPRESS, INC., a Corporation, Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent,
Trans World Airlines, Inc., Intervenor, The Atchison, Topeka and Santa Fe Railway Company, et al., Intervenors.
 No. 15015.
 No. 15026.
 No. 15039.
 No. 15041.
 No. 15042.
 United States Court of Appeals District of Columbia Circuit.
 Argued September 16, 1960.
 Decided February 24, 1961.
 Petition for Rehearing En Banc Denied March 21, 1961.
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Mr. Charles Older, Los Angeles, Cal., with whom Mr. Dayton M. Harrington, Washington, D. C., was on the brief for petitioners in No. 15015. Mr. Richard H. Keatinge, Los Angeles, Cal., also entered an appearance for petitioners in No. 15015.
 
 Mr. Albert F. Beitel, Washington, D. C., for petitioner in No. 15026. Mr. David A. Fegan, Washington, D. C., was on the brief for petitioner in No. 15026.
 Mr. Warren E. Miller, Washington, D. C., for petitioner in No. 15042.
 Mr. O. D. Ozment, Associate General Counsel, Litigation and Research, Civil Aeronautics Board, with whom Mr. Franklin M. Stone, General Counsel, Civil Aeronautics Board, Mr. John H. Wanner, Deputy General Counsel, Civil Aeronautics Board, Messrs. Robert L. Toomey and James E. Nathanson, Attorneys, Civil Aeronautics Board, and Messrs. Robert A. Bicks and Richard A. Solomon, Attorneys, Department of Justice, were on the brief, for respondent.
 Messrs. Howard C. Westwood, William H. Allen, Washington, D. C., Robert L. Stern, William M. Dickson, Chicago, Ill., and James K. Crimmins, New York City, were on the brief for intervenors. Mr. J. D. Feeney, Chicago, Ill., also entered an appearance for intervenor Common Carrier Railroads and intervenors The Atchison, Topeka and Santa Fe Railway Company, et al. Mr. James Francis Reilly, Washington, D. C., also entered an appearance for intervenor United Air Lines, Inc. Mr. James D. Simpson, New York City, also entered an appearance for intervenor Trans World Airlines, Inc.
 Mr. David I. Shapiro, Washington, D. C., entered an appearance for petitioner in No. 15039.
 Mr. Ben Ivan Melnicoff, Washington, D. C., entered an appearance for petitioner in No. 15041.
 Before WILBUR K. MILLER, Chief Judge, and PRETTYMAN and FAHY, Circuit Judges.
 PRETTYMAN, Circuit Judge.
 
 
 1
 Petitioners in these cases are unsuccessful applicants for final authority to perform supplemental air service. Their applications were denied by the Civil Aeronautics Board in Order No. E-13436 on January 28, 1959.[1] The Board found that during the period when these carriers were operating under interim exemptions they had violated provisions of the Civil Aeronautics Act and the Board's regulations and had thus exhibited a lack of "compliance disposition" which disqualified them for final authority as supplemental carriers.[2] By the terms of the order the interim exemption authority under which petitioners had previously been operating was to terminate sixty days after the effective date of the order.
 
 
 2
 In petitioning this court for review of the Board's order these carriers make the following contentions:
 
 
 3
 1. Petitioners were not found unqualified for their existing exemption authority; and because this authority constituted a "license" within the meaning of Section 2(e) of the Administrative Procedure Act[3] the Board erred in cancelling it without bringing a proceeding for that purpose in accordance with Section 9(b) of that Act.[4]
 
 
 4
 2. The Board's procedure was defective because the question of past violations was not in issue and the applicant-carriers had no notice that this question would be tried and determined in this proceeding.
 
 
 5
 3. The Board violated Section 9(b) of the Administrative Procedure Act by terminating petitioners' domestic operating authority before passing upon the foreign and overseas aspects of the applications.
 
 
 6
 4. The Board should reconsider its decision as to these petitioners in the light of this court's decision[5] holding that the Board erred in granting certificates to the qualified applicants.
 
 
 7
 Additional arguments are made by individual carriers; we will discuss them later and separately.
 
 
 8
 We think petitioners' contentions, above stated, cannot be sustained and that the Board's order must be affirmed.
 
 
 9
 This is another phase of a long controversy concerning irregular or nonscheduled air carriers, most of it spelled out in court and Board opinions and rulings.[6] The order here under attack is the culminating order in a long investigation begun in 1951 after a series of lesser efforts over many years to reach a satisfactory conclusion to the problem. In this order the Board made its decision as to the form of the operating authority for these carriers, and its decisions as to the qualifications of the individual applicants. As we have indicated, it found the present petitioners unqualified.
 
 
 10
 * Petitioners argue that the operating authority they possessed under an interim exemption was a "license" that could be cancelled only after a compliance proceeding had been brought against them and they had been given an opportunity to conform their conduct to the law. They claim that the Board cancelled these licenses for nonscheduled service in the process of denying their applications for the new and different supplemental service. This argument fails in several respects.
 
 
 11
 First, assuming for the purposes of the argument that petitioners did have "licenses", they were temporary or conditional. They were not withdrawn, suspended, revoked or annulled within the meaning of Section 9(b) of the Administrative Procedure Act; they expired, or terminated, by their own terms.
 
 
 12
 From its inception in 1938 the Board has been concerned with the role of nonscheduled air carriers in national air transportation. Moreover it was aware from the outset that, if nonscheduled service was to become permanent, careful study would be necessary to define the precise limits of the ultimate operating authority. Because it was difficult to determine whether and to what extent such service was needed, and because such service presented a potential threat to scheduled, certificated service, the Board authorized nonscheduled service only on a temporary basis. Every regulation or order issued by the Board in which this service was permitted carefully conditioned the authority. In December, 1938, for example, when the Board first spoke on the question, it issued an exemption for nonscheduled carriers that was to last "[u]ntil the authority shall adopt further rules, regulations or orders with respect to such matter".[7] An amendment to this regulation issued in 1946 bore the caption "Temporary exemption of non-scheduled operations from certain provisions of Title IV of the Civil Aeronautics Act of 1938, as amended."[8] When the Board imposed the requirement for letters of registration, in 1947, it provided that these letters were to expire upon a finding by the Board that enforcement of Section 401 of the Civil Aeronautics Act[9] would be in the public interest and would no longer be an undue burden upon irregular carriers.[10] In 1949 the Board terminated this "blanket" exemption. In its place it conferred a temporary exemption that was to terminate within thirty days of the effective date of that order unless the carrier filed an application for an individual exemption. If such an application were filed, the temporary exemption would continue "until, but only until, the date specified in the Board's order finally disposing of [the carrier's] application for individual exemption".[11] Petitioners duly filed such applications, and in 1951 these applications were consolidated into the Large Irregular Air Carrier Investigation. At that time the Board stated:[12]
 
 
 13
 "* * * it should be clearly understood by all parties to the proceeding that the Board considers that the issues in this proceeding include the possibility that at its close the Board may deny the applications of the Large Irregular Carriers and enter such further orders as may be necessary to terminate any operating rights which derive from Part 291 or any amendment thereof. Whether the Board will do so, of course, will depend upon the findings made and conclusions reached upon the basis of the record in the proceeding."
 
 
 14
 It was not until this investigation was concluded and the order under review here was issued that the Board made any formal findings with respect to the qualifications of individual carriers. Since 1938 the carriers had been operating at the sufferance of the Board, and there was never any guarantee that all of these carriers would be found qualified to perform the service finally defined by the Board. Indeed there was no guarantee during these years that this type of service would be authorized at all.[13] Thus the proceeding that resulted in the order attacked here was, in a sense, an original licensing proceeding. Our petitioners did not have their licenses revoked as "punishment" for past conduct; they were found unqualified for permanent licenses, because they lacked compliance disposition; and their temporary licenses thereupon expired.
 
 
 15
 Moreover the legislative history of the Administrative Procedure Act makes clear that Section 9(b) was not intended to apply to temporary licenses. Both the Senate[14] and House[15] Reports contain express statements to this effect. And appended to the Senate Report is a letter from the Attorney General to the Chairman of the Senate Judiciary Committee, containing the following commentary on S. 7, the bill that developed into the Administrative Procedure Act: "The second sentence of subsection (b) [of Section 9] is not intended to apply to temporary licenses which may be issued pending the determination of applications for licenses."[16] To the same effect is the Attorney General's Manual on the Administrative Procedure Act, where it is stated (p. 91): "Such permits or licenses may be revoked without `another chance' and regardless of whether there is willfulness or whether the public health, interest, or safety is involved." So, even if the action of the Board could be construed to be a withdrawal, suspension, revocation or annulment, within the meaning of Section 9(b), these petitioners are not aided. It is beyond question that their licenses were temporary.
 
 
 16
 Petitioners contend that their licenses were cancelled in a proceeding in which applications were being considered for a "new and different type of service". But the fact is the applications consolidated into the Large Irregular Air Carrier Investigation were for whatever type of irregular service the Board might finally authorize. The nature of the service was one of the questions to be determined. The Board's decision to discontinue "nonscheduled" service, with its requirement of irregularity, and institute "supplemental" service, limited to ten round trips per month between any two points, was made in Order No. E-9744, November 15, 1955. When that decision was reviewed here, we expressly accepted the Board's conclusion with respect to supplemental service.[17] Our remand in that case related only to the Board's decision to issue interim exemptions. Thus "supplemental" service has been authorized since 1956. The order here under review merely decided which carriers are qualified for that service and what the form of the operating authority would be. At no time did the Board indicate that different qualifications would be required to perform the "different" types of service, i. e., "supplemental" as against "nonscheduled". Petitioners' claim that their "licenses" for nonscheduled service were cancelled when they were found unqualified for supplemental service is without merit.
 
 II
 
 17
 Petitioners say the Board failed to charge specific violations of the Act and regulations and failed to give notice that the issue of violations would be "tried and determined" in this proceeding. Because the findings of specific violations gave rise to the inference that these carriers lacked "compliance disposition", the procedure, they claim, was fatally defective.
 
 
 18
 As we have pointed out, this proceeding was essentially a licensing proceeding. It was not a compliance proceeding. The qualifications of the applicants constituted the ultimate question to be determined, and evidence bearing on this question was to be adduced at the hearing. In such a case we think the Board could not be required to give advance notice of specific disqualifying conduct. The burden is on the applicant to show qualification. Furthermore the record clearly refutes petitioners' contention that they had no notice that violations would be a subject of proof. By ER-142, April 13, 1949, the Board amended Section 292.1 of the Economic Regulations. In that order, which terminated the prior blanket exemptions, it was expressly stated that: "One of the factors which the Board would take into consideration in disposing of such applications is the extent to which the applicant had engaged in regular operations and had otherwise failed to comply with the requirements of the act and the Board's regulations."
 
 
 19
 In 1952, after these individual applications had been consolidated into the newly instituted Large Irregular Air Carrier Investigation, the Board stated in an order[18] disposing of miscellaneous motions and petitions relating to the investigation:
 
 
 20
 "* * * A number of applicants move that the Board direct the Examiner to exclude from the proceeding any evidence with respect to violations prior to September 21, 1951, the date of the Board's order of investigation herein.
 
 
 21
 "Under the Board's decisions in the past and under court decisions, evidence of violations of law or regulations by an applicant is relevant in a proceeding on an application for operating authority. Such evidence, when received, does not necessarily set up a bar to grant of an application, but is to be weighed and considered by the regulatory agency in the light of all the circumstances. * * *
 
 
 22
 "* * * Evidence of past violations will be only one factor to be considered and the receipt of such evidence will not require unfavorable action on an application. On the contrary, we will grant or deny the applications on the basis of all the facts before us. Any applicant against which evidence of violations is produced may be assured that we will be receptive of any showing that it may make which will indicate that under all the circumstances we should accord little or no weight to the evidence of violations, or that there are overbalancing considerations of public interest. However, in the interest of conducting a comprehensive and objective investigation into all pertinent facts, the Board would not be justified at this time in issuing the directive that these applicants request, and the motions will to this extent be denied."
 
 
 23
 Subsequently, in the Board's "Notice of Hearing",[19] it was stated:
 
 
 24
 "B. With respect to disposition of the individual carrier applications, certain additional issues are presented, as follows:
 
 
 25
 "1. * * *
 
 
 26
 * * * * * *
 
 
 27
 "b. Whether the particular applicant is fit, willing and able to perform properly the transportation covered by the respective application, and to conform to the provisions of the Civil Aeronautics Act and the rules, regulations and requirements of the Board thereunder." Petitioners admit that "the parties were informed that evidence of violations would be considered in this proceeding" but claim they had no notice that past violations would be "tried and determined". This admission would appear to be dispositive. The fact of violations was merely evidentiary, a basis for an inference as to future conduct. No sanctions were imposed as a result of the findings, and the issue was "tried and determined" only in the sense that it was established as an evidentiary fact. We are not faced with the question whether the notice given here would be sufficient in a proceeding brought to revoke a license.
 
 
 28
 It is true that petitioners had "business and investment" property of which they could not be deprived without due process of law.[20] We think due process was satisfied here. Petitioners had notice that evidence of violations would be considered, and they had opportunity to put in direct evidence, to cross-examine, and to present rebuttal evidence. A second bite, so to speak, by way of a reopening of the record, is not an element of due process.
 
 III
 
 29
 Petitioners' third contention is also based upon Section 9(b) of the Administrative Procedure Act. That section provides:
 
 
 30
 "In any case in which the licensee has, in accordance with agency rules, made timely and sufficient application for a renewal or a new license, no license with reference to any activity of a continuing nature shall expire until such application shall have been finally determined by the agency."
 
 
 31
 They claim that, because the interim exemption and their applications for permanent authority covered both domestic and foreign-and-overseas operations, the Board could not terminate their domestic authority until it finally disposed of the entire application.
 
 
 32
 Under Section 801 of the Federal Aviation Act of 1958[21] the issuance of a certificate for foreign or overseas air transportation is subject to the approval of the President, and copies of all applications for such certificates must be transmitted to him before hearing thereon. In the order now being reviewed the Board stated that it was not deciding the question of authorizations for foreign and overseas supplemental service, "for no decision will be issued by the Board on this question until it is acted upon by the President." We think the applications were clearly severable. The Board is empowered to make "final" dispositions of applications for domestic service. It cannot do so as to overseas and foreign service until and unless the President approves. Merely because the requests for authorizations for these two types of operation were included in the same application and combined for consideration by the Board, the decision on domestic authority is no less "final".
 
 
 33
 We are now advised[22] that the President, on January 9, 1961, approved the several denials of authority for overseas service as to which the Board had recommended denials. Thus the major premise of these carriers' argument on this point would seem to have been removed.
 
 IV
 
 34
 The fourth argument put forth by these carriers is that the Board denied their applications for exemptions because it decided to issue certificates. Because this court held that the Board erred in issuing certificates, and because they were not found unqualified for exemptions, they say these cases should be remanded so that the Board can reconsider its decision in light of our opinion in United Air Lines, Inc. v. Civil Aeronautics Board.[23] This argument is without merit. The Large Irregular Air Carrier Investigation had three main purposes: to determine the nature of the service to be rendered, to determine which of the applicants were qualified to perform this service, and to determine the form of the operating authority. The Board's decisions on the latter two aspects of the investigation were not interdependent. The nature of the service was decided, for all practical purposes, in Order No. E-9744 and approved by this court.[24] Order No. E-13436, now before us, is concerned primarily with the qualifications of the applicants and the form of the authority. These carriers were found unqualified for any authority, and the Board's decision on the form of the authorization is unrelated to this.
 
 V
 
 35
 We come now to the separate contentions made by some of petitioners, to which we made earlier brief mention. Central Air Transport, Inc., argues that the Board failed to apply to it the same standards it had applied to other carriers found qualified. Central was found to lack compliance disposition because it had violated Section 408 of the Act by permitting another carrier to acquire control of its operations without Board approval. Although other carriers were found to have engaged in similar conduct, there are factual distinctions that make the Board's treatment of this petitioner reasonable. Central's violations were flagrant, deliberate and recurrent, covering almost three years. Moreover the management of Central remained the same throughout the period of illegal operations and thereafter, while in the cases of Paul Mantz and Modern Air Transport there had been significant changes in management after the violations ceased. These differences become crucial when it is remembered that the findings of violations themselves served only as a basis for an inference as to future conduct. Where the character of the illegal conduct or the attendant circumstances suggest that the carrier will be disposed to comply in the future, reasonable distinctions can be made.
 
 
 36
 Currey Air Transport, Ltd., contends that the Board committed prejudicial error in refusing its request to issue subpoenas ad testificandum to four Civil Aeronautics Board employees who had examined Currey's books and records shortly before the hearing. We think there was no prejudicial error. The Board's decision with respect to Currey was clearly based on the sole ground that the carrier had committed willful and serious violations. The testimony that Currey sought to elicit from these Board employees related to methods of accounting and reporting and the carrier's organizational structure and financial condition. Direct evidence of these facts would certainly have a bearing on Currey's qualifications; it was available to Currey, of course, being its own records. What Currey sought was to have employees of the Board confirm this factual data, and possibly also confirm Currey's qualifications in these respects. But the Board's decision was based on grounds wholly different from those to which this evidence would have related. If Currey believed that by putting in favorable evidence relating to its organizational structure and financial stability it could overcome unfavorable inferences as to compliance that might be drawn from its past conduct, it was free to do so. It was not deprived of this opportunity merely because the Board refused to compel testimony from its own employees. Currey was not prejudiced in the end result by this refusal. Currey cites National Labor Relations Board v. Burns[25] and Donnelly Garment Co. v. National Labor Relations Board[26] in support of its position, but these cases are inapposite. There the trial examiners had refused to admit evidence that was clearly material to the issues in dispute; here there was no such refusal.
 
 
 37
 Air Cargo Express was found unqualified for lack of compliance disposition because its owners and managers constituted all but one of a group of men who had owned and controlled Air Transport Associates, Inc., when the latter's operating authority was revoked in an enforcement proceeding. Air Cargo itself was not found to have committed any violations. In a petition to the Board for reconsideration and reopening of the record, the carrier alleged that there had been substantial changes in its ownership and management subsequent to the Examiner's initial decision. The Board denied the petition on the grounds that an applicant cannot escape the effects of an adverse finding "by conveniently arranged transfers of this type."[27] It said there had been no "fundamental change going to the heart of petitioner's qualifications". We think the Board should have granted an opportunity for the petitioner to supplement the record by evidence in support of its allegations. It appears that there was a complete change in the officers and directors of Air Cargo and that only 40 per cent of the carrier's stock is owned by former owners of Air Transport Associates. Of course a carrier found unqualified because of the character of its owners and managers cannot avoid the effects of such a finding by mere paper changes, but a good faith attempt to remedy the cause for disqualification should be respected. Air Cargo must be given an opportunity to establish its qualifications under the changed circumstances alleged. This part of the Board's order will be set aside, and No. 15042 will be remanded for further proceedings consistent with this opinion.
 
 
 38
 The order of the Board, in so far as it is here under attack in Nos. 15015 and 15026, is affirmed.
 
 
 39
 Air Transport Associates, Inc., petitioner in No. 15039, failed and refused to file a brief or to participate in the preparation and filing of briefs on behalf of the other petitioners, as directed by the prehearing order entered by the court in this matter, and its petition will therefore be dismissed. Continental Charters, Inc., petitioner in No. 15041, not having submitted a brief, orally stated it would abide the action of the court with respect to Air Transport Associates, Inc., and accordingly its petition will also be dismissed.
 
 
 40
 So ordered.
 
 
 
 Notes:
 
 
 [1]
 Rehearing was denied in Order No. E-14449 (Sept. 15, 1959)
 
 
 [2]
 Petitioner in No. 15042, Air Cargo Express, Inc., was found unqualified as to compliance disposition because it was owned, controlled and managed by a group of persons who had constituted the major part of the management of Air Transport Associates, Inc., a carrier whose operating authority had previously been revoked by the Board for flagrant violations
 
 
 [3]
 60 Stat. 238 (1946), 5 U.S.C.A. § 1001 (e)
 
 
 [4]
 60 Stat. 242 (1946), 5 U.S.C.A. § 1008 (b)
 
 
 [5]
 United Air Lines, Inc. v. Civil Aeronautics Board, 108 U.S.App.D.C. 1, 278 F.2d 446, judgment vacated per curiam and case remanded with instructions sub nom. All American Airways v. United Air Lines, 364 U.S. 297, 81 S.Ct. 267, 5 L.Ed.2d 89 (1960)
 
 
 [6]
 E. g., United Air Lines, Inc. v. Civil Aeronautics Board, supra note 5; American Airlines v. Civil Aeronautics Board, 98 U.S.App.D.C. 348, 235 F.2d 845 (D.C. Cir.1956), certiorari denied Independent Military Air Transport Ass'n v. American Airlines, 353 U.S. 905, 77 S.Ct. 668, 1 L.Ed.2d 666 (1957); Large Irregular Air Carrier Investigation, 22 C.A.B. 838, 853 (1955); Standard Airlines v. Civil Aeronautics Board, 85 U.S.App.D.C. 29, 177 F.2d 18 (D.C.Cir.1949); Investigation of Nonscheduled Air Services, 6 C.A.B. 1049 (1946); C.A.B. Reg. 400-1, as amended Dec. 7, 1938, 3 Fed.Reg. 2886
 
 
 [7]
 C.A.B. Reg. 400-1, as amended Dec. 7, 1938, 3 Fed.Reg. 2886
 
 
 [8]
 Regs., Serial No. 367, May 17, 1946, 11 Fed.Reg. 6584
 
 
 [9]
 52 Stat. 987 (1938) (now Federal Aviation Act of 1958, § 401, 72 Stat. 754, 49 U.S.C.A. § 1371)
 
 
 [10]
 Regs., Serial No. 388, May 5, 1947, 12 Fed.Reg. 3076
 
 
 [11]
 Regs., Serial No. ER-142, Apr. 13, 1949, 14 Fed.Reg. 1879
 
 
 [12]
 C.A.B. Order No. E-6017 (Jan. 8, 1952)
 
 
 [13]
 We note that we are not here faced with the question whether in a rulemaking proceeding the Board could have revokedall prior operating authority for all nonscheduled or supplemental carriers. The Large Irregular Air Carrier Investigation had both rule-making and adjudicatory aspects, but petitioners here claim to have been aggrieved only by the latter.
 
 
 [14]
 S.Rep. No. 752, 79th Cong., 1st Sess. (1945), Administrative Procedure Act, Legislative History 212 (1946) [hereinafter cited Legis. Hist.]
 
 
 [15]
 H.R.Rep. No. 1980, 79th Cong., 2d Sess. (1946), Legis. Hist. 275
 
 
 [16]
 Legis. Hist. 229
 
 
 [17]
 American Airlines v. Civil Aeronautics Board, 98 U.S.App.D.C. 348, 235 F.2d 845 (1956), certiorari denied Independent Military Air Transport Ass'n v. American Airlines, 353 U.S. 905, 77 S.Ct. 668, 1 L.Ed.2d 666 (1957)
 
 
 [18]
 Order No. E-6017 (Jan. 8, 1952)
 
 
 [19]
 August 12, 1952
 
 
 [20]
 Standard Airlines v. Civil Aeronautics Board, 85 U.S.App.D.C. 29, 177 F.2d 18 (D.C.Cir.1949)
 
 
 [21]
 72 Stat. 782, 49 U.S.C.A. § 1461
 
 
 [22]
 C.A.B. Order No. E-16277 (Jan. 17, 1961)
 
 
 [23]
 Supra note 5
 
 
 [24]
 American Airlines v. Civil Aeronautics Board, supra note 17
 
 
 [25]
 207 F.2d 434 (8th Cir. 1953)
 
 
 [26]
 123 F.2d 215 (8th Cir. 1941)
 
 
 [27]
 C.A.B. Order No. E-14449 (Sept. 15, 1959)
 
 
 
 41
 FAHY, Circuit Judge (concurring in part, dissenting in part).
 
 
 42
 Petitioners, as large irregular carriers, are engaged in foreign and domestic supplemental air service. Their domestic service is involved in their petition for review. Petitioners have been operating by permission of respondent Board. The permission was initially in the form of temporary exemptions granted under section 416 of the Act. These exemptions authorized irregular operations without certification of the carriers under provisions of the Act governing "regular" operations. Later, petitioners continued to operate under "letters of registration," and still later they were required to and did file applications for individual exemptions, their operating authority to be continued, if such applications were timely filed, under prior letters of registration until disposition of the applications. There was still another change in status in respects not material to the questions now presented. By whatever name their operating authority may be called the fact is that petitioners since 1946 have been operating as large irregular carriers with the permission and under the authority of the Board. Accordingly, they were licensees as the term "license" is defined in section 2(e) of the Administrative Procedure Act.[1] Nevertheless, their permission to operate domestically has been terminated by the order under review. This is so whether the order is considered as a revocation of their licenses, a denial of applications for new licenses, or a refusal to renew present operating authority. The essence of the matter, both procedurally and substantively, is that petitioners' licenses have been terminated. The question is whether this has been accomplished in a valid manner.
 
 
 43
 What eventuated was a proceeding under the rule-making provisions of the Administrative Procedure Act. The declared purpose of this investigative proceeding was to determine, first, whether the irregular type of air carrier operations was in the public interest and, if so, secondly, which of the carriers engaged in such operations should be authorized to continue, and under what type of operating authority. The Board found, first, that the continuation of supplemental irregular operations was in the public interest and, secondly, that petitioners, due to past violations of the Act, would not be authorized to continue their operations.[2]
 
 
 44
 I think the licenses have not been validly terminated. The reasons assigned by the Board were past violations of the Act which had not been specified in any notice given to petitioners prior to Board action based on the violations found. No one could well contend that a person could be validly tried upon a general charge of violation of law, notwithstanding after the evidence was in some specific law or laws should be found to have been violated. Of course these proceedings were not a trial for an offense, but the analogy is instructive. Petitioners were advised that the investigation would determine which carriers would be permitted to continue in operation if irregular operations were found to be in the public interest, and that previous violations of the Act would be considered; but no notice was given of specific violations alleged or to be relied upon. What happened was that on all the evidence it was found that certain violations, previously unspecified, had occurred. The examiners first specified these violations in their decision. The Board, I think incorrectly, then refused to reopen the record, taking the position that the hearing had been adequate.
 
 
 45
 If the proceedings are considered as having been focused on applications for new operating authority, petitioners urge that the basis for the adverse action is unwarranted since their existing licenses were cancelled because they were found unqualified for such new authority; and if the proceedings are considered as directed to revocation of existing authority, the revocation requirements of neither the Administrative Procedure Act nor of due process of law were met.
 
 
 46
 As to the Administrative Procedure Act, section 9(b) provides:
 
 
 47
 "Except in cases of willfulness or those in which public health, interest, or safety requires otherwise, no withdrawal, suspension, revocation or annulment of any license shall be lawful unless, prior to the institution of agency proceedings therefor, facts or conduct which may warrant such action shall have been called to the attention of the licensee by the agency in writing and the licensee shall have been accorded opportunity to demonstrate or achieve compliance with all lawful requirements."
 
 
 48
 The Board contends that since the violations were willful petitioners cannot complain of Board failure to comply with this provision. But the Board did not revoke on the theory of willful violations which would dispense with the need of affording opportunity to comply as specified in section 9(b); the Board found willfulness only after the hearing had been held. In such a proceeding it seems to me the type of procedure required by section 9(b) for non-willful violations is necessary to support a revocation of a license. To revoke on the basis of violations, never previously specified, found on evidence of a general character taken in the course of the investigation, is inconsistent with the plain purport, if not the specific language, of section 9(b).[3]
 
 
 49
 And as to due process, I reach the same conclusion as with respect to section 9 (b); that is, the hearing should in any event have been reopened when requested after the specific violations set forth as a possible basis for revocation were first made known by the examiners' decision.
 
 
 50
 The views above expressed I think are consistent with the decision of this court in Standard Airlines, Inc. v. Civil Aeronautics Board, 85 U.S.App.D.C. 29, 177 F.2d 18, and I think are not rendered untenable by Cook Cleland Catalina Airways, Inc. v. Civil Aeronautics Board, 90 U.S.App.D.C. 220, 195 F.2d 206, or Eastern Airlines, Inc. v. Civil Aeronautics Board, 87 U.S.App.D.C. 331, 185 F. 2d 426, vacated as moot, 341 U.S. 901, 71 S.Ct. 613, 95 L.Ed. 1341. In Cook Cleland it was said no hearing was required by the Constitution as no existing business and no existing property was involved. What was said with respect to revocation of a license I think must be limited to the factual situation there before the court. In Eastern Airlines the question was simply whether a hearing was essential to the grant of an exemption under section 416.
 
 
 51
 I concur in the majority opinion insofar as it sets aside the order of the Board with respect to petitioner Air Cargo Express.
 
 
 
 Notes:
 
 
 [1]
 This provision reads as follows:
 "Sec. 2(e) License and Licensing. — `License' includes the whole or part of any agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission. `Licensing' includes agency process respecting the grant, renewal, denial, revocation, suspension, annulment, withdrawal, limitation amendment, modification or conditioning of a license."
 
 
 [60]
 Stat. 238 (1946), 5 U.S.C.A. § 1001 (e)
 
 
 [2]
 The Board also decided that the carriers it found qualified to continue the irregular type of service should be certificated, a decision reversed by this court in United Air Lines, Inc. v. Civil Aeronautics Board, 108 U.S.App.D.C. 1, 278 F.2d 446. On October 24, 1960, the Supreme Court vacated our judgment in the following terms:
 The petition for writ of certiorari is granted. The judgment is vacated and the case is remanded to the Court of Appeals with instructions to retain jurisdiction until such time as further legislation has been enacted or Public Law 86-661 [Act of July 14, 1960, 74 Stat. 527] has expired.
 364 U.S. 297, 81 S.Ct. 267, 5 L.Ed.2d 89.
 
 
 [3]
 The opinion of the majority refers to the language in the legislative history that section 9(b) was not intended to apply to "temporary licenses which may be issued pending the determination of applications for licenses" and states that these were unquestionably temporary licenses, pointing to the fact that since 1938 authority by way of exemptions and letters of registration was carefully conditioned by the Board. Such authority as was granted to these carriers, along with the length of time the authority was enjoyed, does not seem comparable to temporary licenses issued pending determination of applications for licenses, especially in light of the language of section 9(b) actually adopted by Congress