348 F.2d 349
 121 U.S.App.D.C. 120, 61 P.U.R.3d 82
 AMERICAN AIRLINES, INC., et al., Petitioners,
v.
CIVIL AERONAUTICS BOARD, Respondent, Saturn Airways, Inc.,
Capitol Airways, Inc., Intervenors.
TRANS WORLD AIRLINES, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent, Saturn Airways, Inc.,
Capitol Airways, Inc., Intervenors.
PAN AMERICAN WORLD AIRWAYS, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent, Saturn Airways, Inc.,
Capitol Airways, Inc., Intervenors.
 Nos. 18590, 18600, 18608.
 United States Court of Appeals District of Columbia Circuit.
 Argued Nov. 9, 1964.
Decided March 4, 1965.
 
 Mr. James F. Bell, Washington, D.C., with whom Mr. George C. Neal, Washington, D.C., was on the brief for petitioner in No. 18590, argued for all petitioners.
 Mr. Warren E. Baker, Washington, D.C., who was on the brief for petitioner in No. 18600, also argued for all petitioners.
 Mr. O. D. Ozment, Associate Gen. Counsel, Litigation and Legislation, Civil Aeronautics Board, with whom Asst. Atty. Gen. William H. Orrick, Jr., Messrs. John H. Wanner, Gen., Counsel, Joseph B. Goldman, Deputy Gen. Counsel, David A. Heymsfeld, Atty., Civil Aeronautics Board, and Lionel Kestenbaum, Atty., Dept. of Justice, were on the brief, for respondent.
 Mr. Robert M. Lichtman, Washington, D.C., for intervenor Saturn Airways, Inc.
 Mr. Theodore I. Seamon, Washington, D.C., with whom Mr. Lawrence D. Wasko was on the brief, for intervenor Capitol Airways, Inc.
 Messrs. Hubert A. Schneider, Washington, D.C., and Jerry W. Ryan, New York, N.Y., were on the brief for petitioner in No. 18608.
 Before BAZELON, Chief Judge, and WILBUR K. MILLER, Senior Circuit Judge, and BURGER, Circuit Judge.
 BURGER, Circuit Judge:
 
 
 1
 This matter comes to us on petitions to review orders of the Civil Aeronautics Board. With Presidential approval the Board issued certificates of public convenience and necessity to two supplemental carriers authorizing their conduct of charter flights of persons in transatlantic supplemental air transportation. Those orders, E 20530 and E 20531, together with E 20776, which denied petitions for reconsideration and denied a petition to intervene filed by American Airlines, et al., are here for review.
 
 
 2
 The controversy grows out of the Board's revision of Part 295 of its Economic Regulations which was effected pursuant to Orders E 20530 and E 20531. That revision defines 'charter flight' as including
 
 
 3
 'air transportation performed by a direct air carrier on a time, mileage or trip basis where * * * (2) one-half the capacity of an aircraft has been engaged by a person for his own use or by a representative or representatives of a group for the use of such group and the remaining half of the capacity of such aircraft has been engaged by another person for his own use or by a representative or representatives of a second group (provided no such representative is professionally engaged in the formation of groups for the transportation or in the solicitation or sale of transportation services).'
 
 
 4
 Petitioners object to this authorization of 'split charters'-- permitting one half of a plane's capacity to be chartered to each of two eligible groups, neither of which requires the entire aircraft. Petitioners Pan American and TWA claim that they will lose substantial overseas traffic, despite contrary Board findings; petitioners American Airlines et al., domestic trunkline carriers, fear such losses in the future should split-charter authority be extended to competitors in their geographical areas.
 
 
 5
 All of the petitioners assert that the Board lacks the power under the Federal Aviation Act to permit the supplemental carriers to operate so-called split charters. Pan American contends further that even if the Board has the requisite statutory authority to permit split charters its decision to do so here is not justified by the Board's findings and that the order denying reconsideration is invalid for lack of findings. American Airlines et al. contend that their possible future injury gives them standing now to obtain review, entitled them to intervene in the Board's proceeding after the granting of the awards to the supplemental carriers, and required the Board to reconsider its decision.
 
 
 6
 (1)
 
 Jurisdiction To Review
 
 7
 We are confronted at the outset with a determination of which of the questions posed are reviewable by petition in this court. Both the Board and the Department of Justice concede that we may review the legality of the Board's institution of split charters and their views, while by no means dispositive, are entitled to some consideration as evidencing an Executive consensus that there is no cogent policy consideration militating against judicial review; of course the Executive may not by concession create judicial review powers not conferred by Congress and we therefore proceed to the merits of the question. In Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948), the Supreme Court held that orders granting or denying applications of citizen carriers to engage in overseas and foreign air transportation are exempt from Court of Appeals review under Section 1006 of the Civil Aeronautics Act to the same extent as are orders affecting foreign carriers, since both types of orders are subject to Presidential approval. The Court concluded that
 
 
 8
 '* * * Orders of the Board as to certificates for overseas or foreign air transportation are not mature and are therefore not susceptible of judicial review at any time before they are finalized by Presidential approval. After such approval has been given, the final orders embody Presidential discretion as to political matters beyond the competence of the courts to adjudicate.'
 
 
 9
 333 U.S. at 114, 68 S.Ct. at 437. The Court's sweeping language was its answer to a petition which sought relief on the theory that the Board's award of authority to petitioner's competitor, which the President approved, was not based upon substantial evidence. The contention thus went to the merits of a Board award to a particular carrier. The question immediately before us is whether the Waterman principle governs a situation in which a petitioner claims that awards made by the Board, with Presidential approval,[1] exceed the Board's power under the act. Stated in another way, does Waterman govern a situation where the action of the Board, before the matter reaches the President, is beyond the Board's power to act? We think not, for in the latter situation there is nothing legally to submit to the President. Clearly Waterman presupposes lawfully exercised congressional authority in the Board's action, in the first instance, as an indispensable predicate, without which there is nothing Presidential action can approve.
 
 
 10
 We therefore hold that Waterman does not bar our consideration of the Board's power to authorize split charters. We find United States Overseas Airlines, Inc. v. CAB, 95 U.S.App.D.C. 363, 222 F.2d 303 (1955), not in point. That case refused to recognize allegations of denials of procedural due process as a predicate for review of action vested by Congress in the President. Such claims, like one that the action is unsupported by substantial evidence, go to the correctness of an award to someone other than the petitioner. They thus encounter the difficulty, recognized in Waterman, that the President must be free to consider broad 'evidentiary' policy factors not involved, and indeed not relevant, in Board proceedings and that the President must be free to exercise unreviewable discretion as to the weight to be given to such extrajudicial factors.
 
 
 11
 Petitioners here, in contrast, frame the issue as whether the Board may under any circumstances recommend to the President an award of split-charter authority to any carrier. This challenge goes to the Board's power, independent of the Presidential power;[2] we conclude we have jurisdiction to determine whether the Board acted, as claimed, beyond its statutory authority. So far as it may be thought applicable to the instant case our somewhat cryptic observation as to unavailability of judicial review 'now or later' in British Overseas Airways Corp. v. CAB, 113 U.S.App.D.C. 76, 304 F.2d 952 (1962), is dictum. The holding of that case is only that the Board's denial of a motion to dismiss a proceeding as unauthorized is a non-final order and therefore unreviewable in a Court of Appeals. This court's reference to Waterman as precluding Court of Appeals review 'now or later'-- the 'later' being after Presidential action, if any-- went beyond the needs of the holding; that Waterman precluded Court of Appeals review as the case then stood-- the 'now' in the context of the opinion-- could mean only that this court concluded that the Board's order was non-final, since lack of finality is the only ground Waterman gives for the non-reviewability of Board orders prior to Presidential action. 333 U.S. at 114. Moreover, in Alaska Airlines, Inc. v. Pan American World Airways, Inc., 116 U.S.App.D.C. 128, 321 F.2d 394 (1963), we vacated as premature a declaratory judgment which held certain Board action to lack statutory authority. We suggested that a claim that Board action was unauthorized might, contrary to the District Court's assumption, be susceptible of review in this court if the President ultimately gave his approval to such unauthorized Board action. We there said that
 
 
 12
 'Whether the President has statutory or constitutional authority to terminate Pan American's route authorization * * * is quite a different question from the one which faced the Court in Waterman. That case neither settles nor illuminates more than faintly the issues which would face a court reviewing the authority of the Board * * *.'
 
 
 13
 116 U.S.App.D.C. at 130, 321 F.2d at 396. The deference Waterman accords to Presidential discretion in matters of national defense and foreign policy as they bear on overseas air carriers has no relevancy where, as here alleged, the President purports to approve a recommendation which the Board was powerless to make; if indeed the Board has no power, then as a legal reality there was nothing before the President.
 
 
 14
 Pan American contends that the challenged Board decision was not based on 'understandable reasoning and clear and definite findings of fact.' Viewing this contention as an attack on the Board's procedures in making and rendering its decision, we find it met by USOA, supra; insofar as it challenges the substantiality of the evidence on which that decision was based, it is foreclosed by Waterman. We do not reach Pan American's contention that the Board did not adequately consider its allegations of error in passing on its petition for reconsideration, since those allegations go to the merits of the Board's decision, a matter not to be raised here under Waterman; moreover, the claim that Board consideration of those allegations was inadequate raises a procedural question foreclosed by USOA.
 
 
 15
 We also find it unnecessary to reach the claim of American Airlines et al. that the Board erred in denying intervention and reconsideration at their instance or the Board's contention that American et al. lack standing to raise those issues. Pan American and TWA have standing to raise the substantive issues which American et al. would raise and our disposition of those issues renders unnecessary American's further participation.
 
 
 16
 (2)
 
 Validity of Split Charter Orders
 
 17
 The Board's Transatlantic Charter Investigation was instituted in 1960 to determine whether the public convenience and necessity required certification of one or more air carriers to conduct transatlantic passenger charters and appropriate terms and conditions. In 1962 the scheduled overseas carriers established discount group fares for groups of 25 or more passengers travelling together on scheduled flights. The obvious impact of these discount fares on charter transportation by supplemental carriers led to requests to investigate the feasibility of 'split charter' services which would enable supplemental carriers to compete more effectively with group fares of scheduled carriers. Of the various proposals considered[3] the Board adopted the split charter program authorized by the orders now under review. The split charter has been described earlier and is simply the process of chartering one half of an aircraft to each of two unrelated charter groups.
 
 
 18
 The collective challenge to the Board's split charter orders rests on contentions that the Board lacks statutory authority to define 'charter trips' as including any engagement of space less than a single commitment for the entire plane capacity. If it is correct that split charters are precluded from the definition of 'supplemental air transportation' by the statute, there was, as we have indicated, no valid Board order or recommendation on which the President's discretionary power could operate.
 
 
 19
 The Board's findings reflect its consideration of the need for split charters growing out of increased interest in overseas air travel paralleling the expansion in the size and passenger capacity of newer aircraft. It concluded that the 25 passenger group discount fares of scheduled overseas lines would not meet significant needs for group travel which split charter groups would satisfy and that the latter would not seriously divert carriage from scheduled regular route carriers.
 
 
 20
 Supplemental air transportation is defined in Section 101(33) of the Federal Aviation Act of 1958, 72 STAT. 737, as amended, 49 U.S.C. 1301(33) as 'charter trips in air transportation * * * rendered pursuant to a certificate * * *' issued under the act and the Board concluded that this authorized split charters as well as conventional charters of the entire aircraft. Congress considered but did not enact a statutory definition of 'charter trips' and one House Report[4] stated that authority to define that term should be left to the Board.
 
 
 21
 We are unable to conclude that the term charter trips has a fixed meaning or that Congress intended to restrict the Board to a definition of one aircraftone charter. We conclude Congress intended, although not without limits, that the Board should be free to evolve a definition in relation to such variable factors as changing needs and changing aircraft; whatever the limits on the Board's power of definition, those limits are not breached by a definition which permits two groups to charter one half an aircraft each. We can find nothing in the statute or the legislative history or in principle that should freeze the definition of 'charter' to the capacity of standard aircraft of a particular vintage. We agree with the Board that the legislative history reveals that a prime concern of Congress was to maintain the integrity of the charter concept-- to preserve the distinction between group and individually ticketed travel; within these limits it is for the Board to evolve reasonable definitions. In today's swift engineering developments as to size and speed of aircraft a definition embalmed, for example, in such origins as the admiralty law growing out of the sailing vessel era would be an unreasonable and unnecessary restraint on the Board and one we do not find in the statute or its history.
 
 
 22
 Affirmed.
 
 BAZELON, Chief Judge (concurring):
 
 23
 I join the court's opinion, upon my understanding of the basis on which it distinguishes Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948). In this case, unlike Waterman and the cases cited in this court's opinion, the Board's statutory authority to act is challenged. The opinion of the Board and the Department of Justice that we have authority to review Board action in this regard is highly persuasive for me as to the limits of Waterman. That decision manifested a reluctance grounded in the Constitution to exercise the power of judicial review over 'political' decisions of the Executive. When the President's legal spokesman concedes that decisions sought to be reviewed are not political in nature, courts need be cautious only to protect their own processes from abuse. I am satisfied that no such danger of abuse exists as to the question of Board authority, and that our review of this question will not hinder the effective exercise of presidential discretion under the Act. It follows that Waterman does not bar our consideration of the Board's power to authorize split charters.
 
 
 
 [1]
 We have considered the contention that the President has not actually approved the split-charter concept and we find it without merit. See Brief for Respondent, pp. 27-28
 
 
 [2]
 Since, as appears infra, we conclude that the Board has such power under the act, we do not reach the question of jurisdiction to decide whether, or in what circumstances, the President might take action the Board itself is without power to recommend. Cf. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952)
 
 
 [3]
 For example, the Board rejected a proposal to permit charters to travel agents to enable them to compose allexpense tours by air with the agent selling the individual space
 
 
 [4]
 H.R.REP. No. 1177, 87th Cong., 1st Sess. 11 (1961)