**PAN AMERICAN WORLD AIRWAYS, INC., Trans World Airlines, Inc., American Airlines, Inc., Petitioners,**

v.

**CIVIL AERONAUTICS BOARD, Respondent,**

World Airways, Inc., et al., Intervenors.

**Nos. 510, 511, Dockets 30947, 30948.**

United States Court of Appeals Second Circuit.

Argued June 15, 1967.

Decided July 20, 1967.

Edward R. Neaher, New York City (Carl S. Rowe, Gertrude S. Rosenthal and Chadbourne, Parke, Whiteside & Wolff, New York City, on the brief), for petitioners.

Warren L. Sharfman, Associate Gen. Counsel, Litigation and Legislation, C.A. B. (Donald F. Turner, Asst. Atty. Gen., Joseph B. Goldman, Gen. Counsel, C.A.B., O. D. Ozment, Deputy Gen. Counsel, C.A.B., Robert L. Toomey, Atty., C.A.B. and Howard E. Shapiro, Atty., Dept. of Justice, on the brief), for respondent.

Charles A. Hobbs, Washington, D. C. (Glen A. Wilkinson, Paul S. Quinn and Wilkinson, Cragun & Barker, Washington, D. C., on the brief), for intervenor American Society of Travel Agents, Inc.

Clayton L. Burwell, Washington, D. C., Counsel for Trans International Airlines, Inc., and Raymond J. Rasenberger, Washington, D. C., Counsel for Purdue Aeronautics Corp., and World Airways Inc. (Stephen D. Potts, Washington, D. C., Counsel for American Flyers Airlines, Inc., George Berkowitz, New York City, Counsel for Capitol Airways, Inc., and Leonard N. Bebchick, Washington, D. C., Counsel for Saturn Airways, Inc., on the brief), for the intervenor Supplemental Air Carriers.

Before HAYS and FEINBERG, Circuit Judges, and McLEAN, District Judge.*

HAYS, Circuit Judge:

This is a petition to review five orders of the Civil Aeronautics Board awarding certain supplemental air carriers, intervenors in this action, certificates which authorize them to operate so-called "inclusive tours" [1] between points in the

---

* Of the Southern District of New York, sitting by designation.

1. The term "inclusive tour" is, generally speaking, synonymous with the more fa-

United States and various foreign points. Petitioners' principal contention is that the Board lacked the power to authorize inclusive tours. The jurisdiction of this court is invoked under Section 1006 of the Federal Aviation Act of 1958, 49 U.S.C. § 1486. We hold that the Board lacked the power to authorize "inclusive tours" and that the challenged provisions should be stricken from the certificates awarded to the intervening carriers.

I.

Petitioners are three air carriers holding certificates of public convenience and necessity issued by the Civil Aeronautics Board under Section 401(d) (1) of the Federal Aviation Act, 49 U.S.C. § 1371 (d) (1), authorizing them to engage in air transportation between the United States and various points abroad. Each of the intervenors, with the exception of the American Society of Travel Agents, Inc., is a supplemental air carrier[2] defined under Section 101(32) of the Act, 49 U.S.C. § 1301(32), as "an air carrier holding a certificate of public convenience and necessity authorizing it to engage in supplemental air transportation." As the name implies, the services of supplemental air carriers are intended to supplement those of the scheduled car-

riers. See Section 101(33) of the Act, 49 U.S.C. § 1301(33).

In July 1962, Congress enacted Public Law 87–528, 76 Stat. 143, amending the Federal Aviation Act of 1958. The amendment established a comprehensive system for the certification and regulation of supplemental air carriers. In particular, it empowered the Civil Aeronautics Board to grant certificates of public convenience and necessity authorizing these carriers to engage in "supplemental air transportation." Section 401(d) (3), 49 U.S.C. § 1371(d) (3).[3] "Supplemental air transportation" was defined as "charter trips in air transportation * * * to supplement the scheduled service" which regular route carriers such as petitioners are authorized to provide. Section 101(33), 49 U.S.C. § 1301(33).

On March 11, 1966 the Board handed down opinions and orders in proceedings known as the Supplemental Air Service Proceeding and the Reopened Transatlantic Charter Investigation.

One of the orders, issued in the Supplemental Air Service Proceeding, Docket No. 13795, approved the certification of certain supplemental air carriers in the domestic area and authorized them to operate inclusive tour charters. CAB Or-

---

miliar "all expense" or "package" tour. Such a tour includes various land arrangements, for example, hotel accommodations, meals and sightseeing, as well as air transportation. "Inclusive tour charters" are arrangements by which the air carrier charters a plane to a "tour operator" or travel agent who sells the entire package to the public for a single price per person. In this opinion we adopt this terminology which was used by the Board although not by the hearing examiner.

2. At earlier stages of their development these carriers were known variously as "non-scheduled" or "large irregular" air carriers. Their history has been marked by frequent controversy and litigation. See, e. g., Great Lakes Airlines, Inc. v. Civil Aeronautics Board, 111 U.S.App. D.C. 21, 294 F.2d 217, 221, n. 6 and cases there cited, cert. denied, 366 U.S. 965, 81 S.Ct. 1920, 6 L.Ed.2d 1256 (1961).

3. § 1371. *Certificate of public convenience and necessity*
(d) *Issuance*
* * * * *
(3) In the case of an application for a certificate to engage in supplemental air transportation, the Board may issue a certificate, to any applicant not holding a certificate under paragraph (1) or (2) of this subsection, authorizing the whole or any part thereof, and for such periods, as may be required by the public convenience and necessity, if it finds that the applicant is fit, willing, and able properly to perform the transportation covered by the application and to conform to the provisions of this chapter and the rules, regulations, and requirements of the Board hereunder. Any certificate issued pursuant to this paragraph shall contain such limitations as the Board shall find necessary to assure that the service rendered pursuant thereto will be limited to supplemental air transporation as defined in this chapter.

der No. E–23350 (March 11, 1966). Other orders issued under the same name and docket number, (1) approved the certification of certain supplemental carriers to operate in various overseas and foreign areas [4] and authorized them to operate inclusive tours (CAB Order No. E–24237 (March 11, 1966)), and (2) adopted proposed regulations defining various terms and setting out the scope of the carriers' inclusive tour authorization (CAB Order No. E–24238 (March 11, 1966)).

Two other orders were issued the same day under the title Reopened Transatlantic Charter Investigation (All-Expense Tour Phase), Docket No. 11908. Under the first of these orders, the right to operate inclusive tours was added to the certificates previously granted to Capitol Airways and Saturn Airways authorizing them to engage in supplemental air transportation in the transatlantic area. CAB Order No. E–24240 (March 11, 1966). The second order adopted for the authorized transatlantic supplemental carriers the regulations referred to above. CAB Order No. E–24241 (March 11, 1966).

Under the statute the orders concerned with foreign air transportation entered in the Reopened Transatlantic and Supplemental Air Service cases were subject to the President's approval. See Section 801 of the Act, 49 U.S.C. § 1461.[5] Those are the orders now before us for review. No presidential approval was required for the domestic orders entered in the Supplemental Air Service Proceeding. They immediately became final and subject to judicial review. The petitioners in the instant case were among the parties who sought judicial review of the Board's domestic orders in the Court of Appeals for the District of Columbia Circuit, contending primarily that the Board exceeded its statutory powers in granting supplemental carriers inclusive tour authority. That court had previously decided the "split charter" [6] case, American Airlines, Inc. v. Civil Aeronautics Board, 121 U.S.App.D.C. 120, 348 F.2d 349 (1965), in which it had said:

"Congress intended, although not without limits, that the Board should

4. Section 101(21) of the Act, 49 U.S.C. § 1301(21) provides:

"Interstate air transportation", "overseas air transportation", and "foreign air transportation", respectively, mean the carriage by aircraft of persons or property as a common carrier for compensation or hire or the carriage of mail by aircraft, in commerce between, respectively—

(a) a place in any State of the United States, or the District of Columbia, and a place in any other State of the United States, or the District of Columbia; or between places in the same State of the United States through the airspace over any place outside thereof; or between places in the same Territory or possession of the United States, or the District of Columbia;

(b) a place in any State of the United States, or the District of Columbia, and any place in a Territory or possession of the United States; or between a place in a Territory or possession of the United States, and a place in any other Territory or possession of the United States; and

(c) a place in the United States and any place outside thereof;

whether such commerce moves wholly by aircraft or partly by aircraft and partly by other forms of transportation.

5. § 1461. *The President of the United States*

The issuance, denial, transfer, amendment, cancellation, suspension, or revocation of, and the terms, conditions, and limitations contained in, any certificate authorizing an air carrier to engage in overseas or foreign air transportation, or air transportation between places in the same Territory or possession, or any permit issuable to any foreign air carrier under section 1372 of this title, shall be subject to the approval of the President. Copies of all applications in respect of such certificates and permits shall be transmitted to the President by the Board before hearing thereon, and all decisions thereon by the Board shall be submitted to the President before publication thereof.

6. A split charter "is simply the process of chartering one half of an aircraft to each of two unrelated charter groups." American Airlines v. Civil Aeronautics Board, 121 U.S.App.D.C. 120, 348 F.2d 349, 354 (1965).

be free to evolve a definition [of 'charter trips,' 49 U.S.C. § 1301(33)] in relation to such variable factors as changing needs and changing aircraft * * *." 348 F.2d at 354.

Relying in part on the quoted statement and in part on its own analysis of the relevant legislative history, the court rejected the contention that Congress had not empowered the Board to authorize inclusive tours. American Airlines v. Civil Aeronautics Board, 365 F.2d 939 (D.C. Cir. 1966).

Thereafter, on September 27, 1966, the orders concerning foreign air transportation were approved by the President. Petitioners now seek review of the orders in this court contending that the Board exceeded its statutory powers in granting inclusive tour authority to supplemental air carriers. They also urge that the Board erred in denying them a hearing before it granted inclusive tour authority to the supplemental carriers involved in the Reopened Transatlantic Charter Investigation and that the orders are unlawful under the statute since they were approved by only two members of the five man Board, one member dissenting and two not participating.

In view of our decision that the grant of authority for inclusive tours was beyond the Board's power, we find it unnecessary to reach the other points raised by petitioners.

The Board contests petitioners' claims on the merits. It also argues that its power with respect to the orders in question was conclusively determined in the prior action involving these petitioners, American Airlines v. Civil Aeronautics Board, supra, 365 F.2d 939, and that the doctrine of *res judicata* precludes relitigation of this issue.

II.

The Board has moved that the appeal be dismissed or transferred to the Court of Appeals for the District of Columbia Circuit. It is conceded that our court has jurisdiction of the petition and that venue is proper under Section 1006 of the Act, 49 U.S.C. § 1486. However, the Board argues that petitioners are guilty of forum-shopping, seeking a determination from this court contrary to that reached by the District of Columbia Circuit, thus enhancing their opportunity for review in the Supreme Court of the legal issues here tendered. We are urged to transfer the appeal, either under the provisions of 28 U.S.C. § 2112,[7] or in the exercise of our inherent discretionary power.

Section 2112 authorizes transfer only where "proceedings have been instituted in two or more courts of appeals, with respect to the same order." It is clear that the orders before us are not the same as those reviewed by the Court of Appeals for the District of Columbia Circuit. See Far East Conference v. Federal Maritime Comm'n, 119 U.S.App. D.C. 110, 337 F.2d 146, 148 n. 1 (1964), cert. denied, 379 U.S. 991, 85 S.Ct. 704, 13 L.Ed.2d 611 (1965).

7. § 2112. Record on review and enforcement of agency orders.

(a) The several courts of appeals shall have power to adopt, with the approval of the Judicial Conference of the United States, rules, which so far as practicable shall be uniform in all such courts prescribing the time and manner of filing and the contents of the record in all proceedings instituted in the courts of appeals to enjoin, set aside, suspend, modify, or otherwise review or enforce orders of administrative agencies, boards, commissions, and officers, to the extent that the applicable statute does not specifically prescribe such time or manner of filing or contents of the record,

* * * If proceedings have been instituted in two or more courts of appeals with respect to the same order the agency, board, commission, or officer concerned shall file the record in that one of such courts in which a proceeding with respect to such order was first instituted. The other courts in which such proceedings are pending shall thereupon transfer them to the court of appeals in which the record has been filed. For the convenience of the parties in the interest of justice such court may thereafter transfer all the proceedings with respect to such order to any other court of appeals.

██ Even assuming that this court has inherent discretionary power to transfer a case to another court of appeals in the interests of orderly judicial administration (but see Gulf Oil Corp. v. Federal Power Comm'n, 330 F.2d 824 (5th Cir. 1964)), we find nothing in the decided cases that would justify us in transferring this case to the District of Columbia Circuit. We have jurisdiction of the action and, since petitioners' principal place of business is in..the..Second Circuit, venue is properly laid. Cf. Panhandle Eastern Pipe Line Co. v. Federal Power Comm'n, 343 F.2d 905 (8th Cir. 1965); Panhandle Eastern Pipe Line Co. v. Federal Power Comm'n, 337 F.2d 249 (10th Cir. 1964). Reaching the merits in this case will not require us to construe a prior order of another circuit (cf. Pacific Gas & Electric Co. v. Federal Power Comm'n, 106 U.S.App.D.C. 281, 272 F.2d 510 (1958) (accepting transfer from 9th Circuit)) and we are not presented with the very unusual circumstances thought by the court to justify transfer in Eastern Air Lines v. Civil Aeronautics Board, 122 U.S.App.D.C. 375, 354 F.2d 507 (1965).

In the absence of any showing of inconvenience to respondent, we are not convinced that there are any interests of sound judicial administration which suggest that this case should be transferred. We can perceive no reason for treating this case as an exception to the principle affording a litigant wide latitude in his selection of a forum where Congress has given him a choice.

### III.

The Board's motion to dismiss is based on its contention that the doctrine of Chicago & S. Air Lines v. Waterman S. S. Co., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948), precludes review of the Board's challenged orders and that, in any event, principles of *res judicata* prevent petitioners from relitigating the issues. We hold that neither the *Waterman* doctrine nor principles of *res judicata* bar us from deciding the merits of petitioners' claim.

In the *Waterman* case petitioner sought to invalidate a Board order awarding route authority for overseas and foreign air transportation. In accordance with Section 801 of the statute, 49 U.S.C. § 1461 (reprinted in footnote 5 supra), the order had been submitted to the President and had been approved by him. Petitioner did not challenge the regularity of the Board's proceedings and apparently raised no issue as to the Board's statutory authority; instead it attacked the correctness of the Board's findings and the adequacy of the evidence supporting them. The Supreme Court held that:

"[O]rders of the Board as to certificates for overseas or foreign air transportation are not mature and are therefore not susceptible of judicial review at any time before they are finalized by Presidential approval. After such approval has been given, the final orders embody Presidential discretion as to political matters beyond the competence of the courts to adjudicate." 333 U.S. at 114, 68 S. Ct. at 437.

██ We need not decide whether, as has been argued, the *Waterman* decision rests on a misinterpretation of Section 1006 of the Act, 49 U.S.C. § 1486 providing for judicial review of the Board's orders. See Miller, The Waterman Doctrine Revisited, 54 Geo.L.J. 5, 6–9 (1965). We argee with the Court of Appeals for the District of Columbia Circuit that the *Waterman* case does not "govern a situation where the action of the Board, before the matter reaches the President, is beyond the Board's power to act." American Airlines v. Civil Aeronautics Board, supra, 348 F.2d at 352. As the court there stated:

"Clearly, *Waterman* presupposes lawfully exercised congressional authority in the Board's action, in the first instance, as an indispensable predicate, without which there is nothing Presidential action can approve." Ibid.; cf. id. at 354–355 (concurring opinion); see generally, Miller, op. cit. supra.

*Waterman,* therefore, presents no obstacle to the attack on the Board's orders in this case.

■ We also reject the Board's contention that the doctrine of *res judicata* bars further litigation of the issues now before us.

■ The principles to be applied were summarized by the Supreme Court in Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948):

> "[I]f the very same facts and no others are involved in the second case * * * the prior judgment will be conclusive as to the same legal issues which appear, assuming no intervening doctrinal change. But if the relevant facts in the two cases are separable, even though they be similar or identical, collateral estoppel does not govern the legal issues which recur in the second case." 333 U.S. at 601, 68 S.Ct. at 721 (footnote omitted);

see Consolidated Edison Co. of N. Y. v. United States, 279 F.2d 152, 154 (2d Cir. 1960), aff'd 366 U.S. 380, 81 S.Ct. 1326, 6 L.Ed.2d 356 (1961); cf. Federal Power Comm'n v. Amerada Petroleum Corp., 379 U.S. 687, 690, 85 S.Ct. 632, 13 L.Ed.2d 605 (1965); United States v. Stone & Downer Co., 274 U.S. 225, 47 S.Ct. 616, 71 L.Ed. 1013 (1927); Grandview Dairy v. Jones, 157 F.2d 5, 9, 10 (2d Cir.), cert. denied, 329 U.S. 787, 67 S.Ct. 355, 91 L.Ed. 675 (1946); see generally Developments in the Law—Res Judicata, 65 Harv.L.Rev. 818, 843–44 (1952).

More recently, in Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), the Court said that the

> "doctrine makes conclusive in subsequent proceedings only determinations of fact, and mixed fact and law, that were essential to the decision. Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 601–602, 68 S.Ct. 715, 92 L.Ed. 898; Tait v. Western Maryland R. Co., 289 U.S. 620, 53 S.Ct. 706, 77 L.Ed. 1405 [1933]; The Evergreens v. Nunan, 2 Cir., 141 F.2d 927, 928, 152 A.L.R. 1187 [(2d Cir.), cert. denied, 323 U.S. 720, 65 S.Ct 49, 89 L.Ed. 579 (1944)]." 354 U.S. at 336, 77 S.Ct. at 1086; See Restatement, Judgments § 70, comment e.

The operative facts in this case, involving overseas and international air transportation, are different from those before the District of Columbia Circuit in the domestic charter case. Separate exhibits relating to each area were admitted in the proceedings before the Board. In their opinions the Board and examiner considered each area separately, noting, for example, the different amounts of charter traffic involved and the different consequences, in terms of potential diversion of passengers from the regularly scheduled carriers, that inclusive tours would have in each market. The orders here challenged became final at a different time and are clearly distinguishable from those involved in the domestic charter litigation.

None of the cases cited by the Board supports the conclusion that principles of *res judicata* preclude litigation of the question of law here involved. For example, the "order" challenged in Cities Service Co. v. Securities and Exchange Comm'n, 257 F.2d 926 (3d Cir. 1958) was merely a phase of the order which had been previously upheld by this court in Cities Service Co. v. Securities and Exchange Comm'n, 247 F.2d 646 (2d Cir. 1957), cert. denied, 355 U.S. 912, 78 S.Ct. 341, 2 L.Ed.2d 273 (1958). Petitioner was thus properly precluded from relitigating the issue. Bartsch v. Washington Metropolitan Area Transit Comm'n, 357 F.2d 923 (4th Cir. 1966) is distinguishable on similar grounds.

■ This court has said that "the law of collateral estoppel is 'growing law.'" United States v. Russell Mfg. Co., 349 F.2d 13, 18–19 (2d Cir. 1965); see also B. R. DeWitt, Inc. v. Hall, 19 N.Y.2d 141, 225 N.E.2d 195, 278 N.Y.S. 2d 596 (1967). Nevertheless judicial aversion to forum shopping is not a sufficient ground for precluding litigation

of a question of law by extending the doctrine of *res judicata* into areas traditionally governed by "the ordinary rule of stare decisis." Commissioner of Internal Revenue v. Sunnen, supra, 333 U.S. at 601, 68 S.Ct. at 721, 92 L.Ed. 898; cf. Island Airlines, Inc. v. Civil Aeronautics Board, 363 F.2d 120, 123 (9th Cir. 1966). We therefore consider ourselves free "to make an independent examination of the legal matters at issue." Commissioner of Internal Revenue v. Sunnen, supra, 333 U.S. at 601, 68 S.Ct. at 721.

### IV.

█ The question before us is whether the Board's statutory authority to issue certificates of public convenience and necessity for "supplemental air transportation," defined as "charter trips in air transportation," (Section 101(33) of the Act, 49 U.S.C. § 1301(33)) includes the power to authorize inclusive tour charters.[8] Consideration of the legislative history of the Act leads us to the conclusion that the term "charter trips" was not intended to embrace the inclusive tour charters authorized by the Board's orders.

The provisions in question were added to the Federal Aviation Act by Public

Law 87–528. As we have pointed out this amendatory legislation established a comprehensive system for the certification and regulation of supplemental air carriers. Its principal purposes were to clarify the permissible field of operations of the supplemental carriers,[9] to assure their economic viability, to eliminate marginal and unsafe operators and "to maintain the regulatory scheme of the Federal Aviation Act and the protection of the certificated carriers such as petitioners by eliminating unregulated individually ticketed point-to-point competition from the supplementals." American Airlines, Inc. v. Civil Aeronautics Board, supra, 365 F.2d at 944–945; see authorities cited id., at n. 8.

The bill which evolved into Public Law 87–528 was prepared by the Board and introduced in both houses of Congress early in the 87th Congress. See S. 1969, 87th Cong., 1st Sess. (1961); H.R. 7318, 87th Cong., 1st Sess. (1961), U.S.Code Cong., Admin. News 1962, p. 1844. Also introduced in the House was a bill proposed by the supplemental air carriers, H.R. 7512, 87th Cong., 1st Sess. (1961).

The definition of "supplemental air transportation" found in the Board's bill[10] would have permitted the Board

8. The question presented is not whether Congress withdrew from the Board a pre-existing power to grant inclusive tour authority. "[P]rior to 1962 the Board had never authorized inclusive tour authority for the supplementals." American Airlines v. Civil Aeronautics Board, supra, 365 F.2d at 946. See also Hearings Before the Aviation Subcommittee of the Senate Committee on Commerce, 87th Cong., 1st Sess. 111 (1961).

9. The statute was in part a response to the decisions in United Air Lines v. Civil Aeronautics Board, 108 U.S.App. D.C. 1, 278 F.2d 446, vacated, 364 U.S. 297, 81 S.Ct. 267, 5 L.Ed.2d 89 (1960) and American Airlines v. Civil Aeronautics Board, 235 F.2d 845 (1956), cert. denied, Independent Military Air Transport Ass'n v. American Airlines, Inc., 353 U.S. 905, 77 S.Ct. 668, 1 L.Ed.2d 666 (1957), which the Board thought had placed in doubt the statutory basis for the continued operation of supplemental carriers under existing law. See Hearings

Before the Aviation Subcommittee of the Senate Committee on Commerce, 87th Cong., 1st Sess. 5, 281–83 (1961); Hearings Before a Subcommittee of the House Committee on Interstate and Foreign Commerce, 87th Cong., 1st Sess. 10, 13, 29 (1961).

10. The Board's bill provided:
"(32) 'Supplemental air carrier' means an air carrier holding a certificate of public convenience and necessity authorizing it to engage in supplemental air transportation.
"(33) 'Supplemental air transportation' means air transportation rendered pursuant to a certificate of public convenience and necessity which contains such limitations as to frequency of service, size or type of equipment, or otherwise, as will assure that the service so authorized remains supplemental to the service authorized by certificates of public convenience and necessity issued pursuant to sections 401(d) (1) and (2) of this Act."

to certify supplemental air carriers to perform a broad range of services including not only existing charter services but also the limited individually ticketed transportation for the general public that was then permitted under temporary legislation passed by Congress. See Public Law 86–661, 74 Stat. 527 (1960); H.R. 7318, Section 2, 87th Cong., 1st Sess. (1961); see also Public Law 87–528, Section 7, reprinted after 49 U.S.C. § 1371. The definition contained in the bill proposed by the supplemental carriers went even further. It would have authorized "unlimited charter operations on a planeload basis for the carriage of passengers and property * * * with the word 'charter' herein being defined as air transportation performed pursuant to an agreement for the use of the entire capacity of an aircraft * * *." H.R. 7512, 87th Cong., 1st Sess. (1961). It also would have permitted "individually ticketed passenger * * * operations * * * in interstate, overseas and territorial air transportation." Ibid.

Hearings at which representatives of the Board, the scheduled aircarriers and the supplementals all testified were held in June, 1961 before the Aviation Subcommittee of the Senate Committee on Commerce and before a Subcommittee of the House Committee on Interstate and Foreign Commerce. At the hearings the Board made clear its opposition to any arrangement that would permit travel agents to solicit the general public in forming charter groups. See, e. g., Senate Hearings, supra n. 9, at 29.

Following the hearings each committee reported out its own bill. Under the Senate Bill the Board was expressly empowered to authorize supplemental carriers to operate inclusive tours.[11] With the express exception of the "all expense-paid tour," the Senate bill was intended to prevent the Board from authorizing "individually ticketed service whether offered by an air carrier directly or by a travel agent." S.Rep. No. 688, 87th Cong., 1st Sess. 13–14 (1961), U.S.Code Cong. & Admin.News 1962, p. 1852. However it did not, as the Board contends, require that supplementals be certificated to operate inclusive tours. Its language was merely permissive, authorizing the Board to grant such authority when required by the public need and consistent with the capability and interests of the particular carrier. "[T]he bill does not require the Board to grant every supplemental carrier any particular charter authority." See S.Rep. No. 688, 87th Cong., 1st Sess. 12–13 (1961), U.S.Code Cong. & Admin.News 1962, p. 1852.

The bill passed the Senate on August 28, 1961.

The bill reported out by the House Committee, like the Senate bill, worked substantial changes in the legislation drafted by the Board. However, unlike the Senate bill, the House version did not define the term charter although that term is found in the bill's definition of supplemental air transportation.[12] The definition of "supplemental air transportation" included in the House bill was

11. The bill defined "charter service" to mean:
"air transportation performed by an air carrier holding a certificate of public convenience and necessity where the entire capacity of one or more aircraft has been engaged for the movement of persons and their baggage or for the movement of property on a time, mileage, or trip basis, but shall not include transportation services offered by an air carrier to individual members of the general public or performed by an air carrier under an arrangement with any person who provides or offers to provide transportation services to individual members of the general public, other than as a member of a group on an all-expense-paid tour."

12. "(33) 'Supplemental air transportation' means charter trips in air transportation, other than the transportation of mail by aircraft, rendered pursuant to a certificate of public convenience and necessity issued pursuant to section 401(d)(3) of this Act to supplement the scheduled service authorized by certificates of public convenience and necessity issued pursuant to sections 401(d)(1) and (2) of this Act."

ultimately enacted by Congress as part of Public Law 87–528. See 49 U.S.C. § 1301(33).

Of particular importance in deciding what was the intended scope of the Board's powers under this bill which was passed by the House on September 18, 1961, is the statement of the House Committee that its bill "would give the Board some, but not all, of the authority requested by it. The committee substitute would establish guidelines for the Board to follow in exercising its authority to certificate supplemental carriers, especially, in the field of individually ticketed operations." H.R.Rep. No. 1177, 87th Cong., 1st Sess. 6–7 (1961).

▋ In deciding whether grant of inclusive tour authority violates the limitations of the statute it must be remembered "that a prime concern of Congress was to maintain the integrity of the charter concept—to preserve the distinction between group and individually ticketed travel." American Airlines v. Civil Aeronautics Board, supra, 348 F.2d at 354. See Conference Report, H.R.Rep. No. 1950, 87th Cong., 2d Sess. 14 (1967).

It is clear that the fact that the Board has the power to define "charter" to include split charters (see American Airlines v. Civil Aeronautics Board, supra, 348 F.2d 349), a device permitting the Masons and Elks each to charter one half of the capacity of an aircraft, does not mean that the Board is free to adopt a definition that contravenes basic policies laid down in the Act. To permit the selling of individual tickets to the general public in direct competition with the regularly scheduled airlines, regardless of whether such selling is done through the medium of a travel agent who has first "chartered" the plane, does violate basic policies of the Act. Any lingering ambiguities clouding this issue are dispelled by the subsequent history of the House and Senate bills, to which we now turn.

The conflicting House and Senate bills were submitted to a Conference Committee which reported out a substitute bill that was ultimately enacted as Public Law 87–528. The substitute followed the House version, eliminating the definition of the term "charter" found in the Senate bill. It is clear from the conference report that one purpose of the Committee in adopting the provisions of the House bill was to prohibit "individually ticketed and waybilled services on a permanent basis." [13] See Conference Report, H.R.Rep. No. 1950, 87th Cong., 2d Sess. 14 (1962), U.S.Code Cong. & Admin.News 1962, p. 1869.

Even more direct and more persuasive evidence is available concerning the intention of the conferees in striking from the bill the provision that would have permitted all expense package tours. Several of the bill's floor managers addressed themselves to this subject dur-

---

13. The statute as enacted permits only two exceptions to the general rule forbidding supplemental carriers to provide individually ticketed services. The first exception, Section 9 of Public Law 87–528 provided a two year period, now expired, during which the Board could authorize such services in order "to permit an orderly transition to an all-charter operation." Reprinted following 49 U.S.C. § 1371; See Conference Report, H.R.Rep. No. 1950, 87th Cong., 2d Sess. 7, 14 (1962). The second authorizes the Board to issue a "special operating authorization" for a period of 30 days subject to renewal for a maximum of 60 additional days. Such authorization, enabling a supplemental carrier to engage in individually ticketed operations, could be issued only on a showing that "the capacity for air transportation being offered by the holder of a certificate of public convenience and necessity between particular points in the United States is, or will be, temporarily insufficient to meet the requirements of the public or the postal service," or that there is a temporary requirement for such service between two points not regularly served by a scheduled carrier. Section 417 of the Act, 49 U.S.C. § 1387; see Conference Report, H.R.Rep. No. 1950, 87th Cong., 2d Sess. 4 (1962); H.R.Rep. No. 1177, 87th Cong., 1st Sess. 2, 12–13 (1961).

ing the debate on the bill in their respective houses. They were unanimous in declaring that the "all-expense tours that were provided for in the Senate definition were not accepted by the House, and the Senate receded and concurred in [the House's] position on that." 108 Cong.Rec. 12322 (June 29, 1962) (remarks of Rep. Williams); see remarks of Rep. Walter, ibid. Their statements as to this limitation on the Board's authority went unchallenged.

For example, Senator Scott stated:

"The Senate bill proposed to modify the established concept of charter by permitting charters to 'a group on an all-expense-paid tour.' Such a group could have been assembled from the general public * * *

The committee of conference wisely eliminated the Senate provision. The bill thus, in effect, confirms the established law as to a charter in air transportation. There should be no question about that. The Congress has considered, and has rejected, a proposal to change the established meaning of charter so as to have permitted travel agent charters for all-expense tours. Such charters have no place in air transportation." 108 Cong.Rec. 12284–85 (June 29, 1962).

Senator Thurmond stated:

"I am advised that the CAB Bureau of Economics has advocated that a so-called all-expense tour concept be grafted onto the existing charter definition. This would be intolerable, and has been expressly rejected by the conferees. The Senate receded from its charter definition which included this all-expense tour provision." 108 Cong. Rec. 12285 (June 29, 1962).

In the House, Representative Harris, Chairman of the House Interstate Commerce Committee, made clear that while "the Senate proposed to change the well established meaning of 'charter,'" the House objected to the change.

"A charter in the aviation field has always meant the engagement of the entire capacity of the aircraft for a particular purpose by a single engaging party. Travel agents, being agents for transportation services, rather than carriers themselves, have never been allowed to engage airplanes in their own name for their own account. Nor should they be allowed to. That is why the House objected to the proposal of the Senate including the 'all-expense tour' language. As explained in the House report, we felt the Board should be in a position to deal effectively with any efforts to abuse the meaning of charter." 108 Cong. Rec. 12322 (June 29, 1962).

He went on to read a statement, identical to one submitted later by Representative Collier:

"The bill, as reported by the conference committee, contains no definition of charter. The law is well established that, in air transportation, charter means essentially the lease of the entire capacity of an aircraft for a period of time or a particular trip, for the transportation of cargo or persons and baggage, on a basis which does not include solicitation of the general public, or any device where individually ticketed services would be offered or performed under guise of charter. The basic concept being thus clear, it is important that the Civil Aeronautics Board, by regulation and other appropriate measures, make sure that charter serves its planeload service concept and is not employed as a subterfuge to perform individually ticketed services. Manifestly, the nature of such subterfuge may change from time to time, and the regulatory agency needs some flexibility to modify its regulations to guard against any new subterfuges that may emerge. For this reason, the House committee objected to any attempt to freeze into the act a definition of charter service which would prevent the Board from dealing effectively with abuses. Thus the bill, as passed by the House, contained no definition of charter.

The Senate bill, on the other hand, contained a definition of charter service. This was necessary, in large part, because the Senate proposed to modify the established concept of charter in order to permit carriage, as charter, of 'a group on an all-expense paid tour.' The Senate conferees have receded from insistence on the all-expense-paid tour exception, it followed that the remainder of the Senate definition was superfluous since it merely stated established law and policy." 108 Cong.Rec. 12322 (June 29, 1962); see id. at 12324 (remarks of Rep. Collier).

Senator Cotton said:

"The conferees agreed to drop the language in the Senate bill which defined charter service, and permitted the sale of tickets on charter flights to individual members of the general public who were on all-expense-paid tours. I am wholly in accord with the action in eliminating the all-expense tour provision and thus refusing to confer this power on the Board." 108 Cong.Rec. 12284 (June 29, 1962).

These statements are specific in rejecting the notion that the term charter can be construed to include all expense tours. We therefore reject the argument that the legislators' concern was with abuses growing out of the Board's prior practice of allowing supplemental carriers to perform limited scheduled individually ticketed travel. Regardless of the extent to which there may have been legislative concern based on this prior experience, indeed whether or not the expression of concern was misguided or wholly unwarranted, it was in fact manifested in a congressional declaration binding on both the Board and this court, that was clearly intended to forbid the Board to authorize inclusive tours.

The Board also argues that many of the statements made on the floor of Congress were directed against split charters as well and that the Board's power to authorize such charters has nevertheless been upheld. See American Airlines v. Civil Aeronautics Board, supra, 348 F.2d 349. While we have no occasion to pass on the question of the propriety of split charters we note that Congressional concern with their potential impact is much less clear from the Committee reports and hearings than is the intention to prohibit individually ticketed operations in whatever guise, by supplemental carriers. Moreover, the legislative history involved in the inclusive tour question, with one house passing legislation that would have specifically empowered the Board to authorize package tours only to have the provision deleted by the Conference Committee with the floor managers unanimous in their explanations of the change, is not repeated in the case of split charters. See, e. g., 108 Cong.Rec. 12283 (June 29, 1962) (remarks of Sen. Monroney). On the contrary, the provision deleted from the Senate bill would in fact have forbidden split charters. See Section 101(13) of the bill, S.Rep. No. 688, 87th Cong., 1st Sess. 13, 22 (1961) (reprinted n. 11 supra).

But the Board urges that in construing the statute we should not give any weight to statements made in floor debate. In determining whether it had the power to authorize inclusive tours, the Board, finding the statute and committee reports clear, declared that there was "no sound reason for attempting to analyze the statements made at the time of the passage of the bill by certain of its floor managers." Board Order E-23350 (March 11, 1966).

■ We do not agree. That Congress adopted the House version of the bill, specifically rejecting the Senate's conflicting version, is of course an extremely significant factor in determining what was Congress' intention with respect to the matters in issue. See, e. g., First Nat'l Bank of Logan, Utah v. Walker Bank, 385 U.S. 252, 258, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966). It would be foolish indeed to disregard the one source of legislative history that explains the reasons for the conference committee's action.

Nor are we here concerned with general remarks made in debate which contradict either the face of the statute or statements in committee reports. On the contrary, we have before us on the one hand a statute that is not clear on its face and committee reports that seem to support petitioners' view although they can perhaps be deemed ambiguous. On the other hand we have statements made by the floor managers that fully explain the changes in the bill. These floor managers were members of the legislative committees that held extensive hearings and were responsible for formulating the legislation.[14]

Only recently, in circumstances similar to those in the instant case, a unanimous Supreme Court relied on statements made in debate, not only by a sponsor of legislation and by a member of the Conference Committee but also by other members of Congress, and regarded such statements as authoritative indicators of congressional intent. First Nat'l Bank of Logan, Utah v. Walker Bank, supra, 385 U.S. at 258–260, 87 S.Ct. 492; see also Brown Shoe Co. v. United States, 370 U.S. 294, 311–323, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

■■■ The authorities cited by the Board do not support the view that we may disregard or give little or no weight to statements made on the floor of Congress under the circumstances of this case. In United States v. International Union United Automobile, etc., Workers (UAW–CIO), 352 U.S. 567, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957) although the Court did say that debate is not entitled to the same weight "as carefully considered committee reports," it still examined the debate, finding that it confirmed what was contained in the reports. 352 U.S. at 586–587 & n. 1, 77 S.Ct. 529 Duplex Printing Press Co. v. Deering, 254 U.S. 443, 474–475, 41 S.Ct. 172, 65 L.Ed. 349 (1921) exhibits a similar treatment of Congressional debate. Nicholas v. Denver & Rio Grande W. R. R., 195 F.2d 428, 431–432 (10th Cir. 1952), whatever dictum the opinion may contain to the contrary, fully supports the position that we take here.

If, as we hold, Congress did not give the Board power to authorize inclusive tours, it is immaterial whether, as the Board contends, the proposed regulations will be effective in curbing abuses of the inclusive tour certificates.

Since the Motor Carrier Act is quite different from the Federal Aviation Act in language, statutory structure and legislative history, the fact that all expense tours have been approved under the Motor Carrier Act (see National Bus Traffic Ass'n v. United States, 143 F.Supp. 689 (D.N.J.1956), aff'd per curiam, 352 U.S. 1020, 77 S.Ct. 589, 1 L.Ed.2d 595 (1957)) is not at all persuasive in construing Public Law 87–528, even if we assume that the tours there authorized are similar to those approved by the Board in this case, an assumption that petitioners vigorously contest.

We hold that the certificates before us awarding inclusive tour authority to supplemental air carriers in foreign and overseas transportation are invalid.

Since our conclusion that the Board acted in excess of its statutory powers is dispositive of the case, we need not pass on the other points raised by petitioners.

The orders are set aside and the case remanded to the Board for further proceedings not inconsistent with this opinion.

14. For example, Representative Harris was the Chairman of the House Committee on Interstate and Foreign Commerce, Representative Williams was Chairman of the Subcommittee on Transportation and Aeronautics of which Representative Collier was a member, Senator Monroney was chairman of the Subcommittee on Aviation, Senators Thurmond, Cotton, Morton and Scott were on that committee.