AVIATION CONSUMER ACTION
PROJECT, Plaintiff,

v.

CIVIL AERONAUTICS BOARD,
Defendant.

Civ. A. No. 413–73.

United States District Court,
District of Columbia.

May 10, 1976.

**5.** *Maggiore Bakery, Inc. v. Esperdy*, 238 F.Supp. 374 (S.D.N.Y.1964), and *Lechich v. Rinaldi*, 246 F.Supp. 675 (D.N.J.1965). See also *United States ex rel. Dolenz v. Shaughnessy*, 200 F.2d 288 (2nd Cir. 1952), cert. den., 345 U.S. 928, 73 S.Ct. 780, 97 L.Ed. 1358 (1970).

Larry P. Ellsworth, Washington, D. C., for plaintiff.

Earl J. Silbert, U. S. Atty., George A. Stohner, Asst. U. S. Atty., Washington, D. C., for defendant.

## MEMORANDUM AND ORDER

WILLIAM B. JONES, Chief Judge.

This is an action under the Freedom of Information Act [FOIA], 5 U.S.C. § 552, to order the defendant, Civil Aeronautics Board [CAB], to produce a Board decision concerning the merger of Eastern Airlines, Inc., and Caribbean-Atlantic Airlines, Inc., and to enjoin the CAB from withholding future similar decisions until approved by the President. The plaintiff in this case, Aviation Consumer Action Project [ACAP], is a nonprofit organization incorporated in the District of Columbia and engaged in advocating, promoting and protecting the interests of aviation and general consumers. The defendant is the statutory authority for regulating United States commercial aviation, and under the Federal Aviation Act [FAA], 49 U.S.C. § 1301, *et seq.*, is charged with the duty to issue decisions in connection with proposed mergers of domestic and foreign airlines. *See* 49 U.S.C. § 1461.

The CAB by decision dated August 3, 1972, disapproved the proposed merger of Eastern Airlines, Inc., and Caribbean-Atlantic Airlines, Inc. The President by letter dated October 19, 1972, and pursuant to statutory authority, 49 U.S.C. § 1461, returned the decision to the CAB and ordered further consideration by the Board. The CAB on October 30, 1972, published its August 3, 1972 decision, and then by a supplemental opinion dated February 2, 1973, again denied the proposed merger. The President by letter dated April 11, 1973, disapproved the Board's supplemental opinion and directed the CAB to approve the merger.

This cause of action arose when the plaintiff on February 23, 1973, requested access to the defendant's "new decision" in the Eastern-Caribbean merger case. The CAB by letter dated March 6, 1973, denied plaintiff's request. On April 19, 1973, after the President had acted upon the Board's decision, the document in question was made public.

Plaintiff asserts that the FOIA requires the decision of the Board to be made public as soon as it is submitted to the President. It seeks an order permanently enjoining the defendant from further withholding any decision of the CAB once transmitted to the President. Defendant contends that disclosure is prohibited by section 801 of the FAA, 49 U.S.C. § 1461, thereby rendering the document exempt from disclosure prior to such action pursuant to exemption 3 of the FOIA, 5 U.S.C. § 552(b)(3). The defendant argues in the alternative that the document is exempt from disclosure under exemption 5, 5 U.S.C. § 552(b)(5).

On July 13, 1973, this Court dismissed the action as moot. On appeal, defendant conceded that the action was not moot, and the case was remanded to this Court. Both parties moved for summary judgment over eleven months ago, but the case was held in abeyance pending settlement discussions, which ultimately proved unfruitful. At a status call on February 27, 1976, this Court stated it would proceed to decide the pending motions.

### EXEMPTION 3

■ Defendant contends that the decisions of the Board are exempt from disclosure under 5 U.S.C. § 552(b)(3) which exempts from disclosure matters which are "specifically exempted from disclosure by statute," by virtue of 49 U.S.C. § 1461(a), which provides:

> The issuance, denial, transfer, amendment, cancellation, suspension, or revocation of, and the terms, conditions, and limitations contained in, any certificate authorizing an air carrier to engage in overseas or foreign air transportation, or air transportation between places in the same Territory or possession, or any permit issuable to any foreign air carrier under section 1372 of this title, shall be subject to the approval of the President. Copies of all applications in respect to such certificates and permits shall be transmitted to the President by the Board before hearing thereon, and all decisions thereon by the Board shall be

submitted to the President before publication thereof.

According to the defendant, only after the President approves or disapproves the Board's order and opinion is there a requirement that the decision be made public.

In analyzing a statute, courts first look to the language, and if unclear or ambiguous, they examine its legislative history and other judicial or agency decisions which might throw light on its meaning. In the instant case, the statute on its face is clear and unambiguous. Thus, it states that "[c]opies of all applications in respect of such certificates and permits shall be transmitted to the President by the Board before hearing thereon, and *all decisions thereon by the Board shall be submitted to the President before publication thereof.*" (emphasis added) Publication of a Board decision is prohibited before the decision is submitted to the President. There is no mention of extending the prohibition from the date of submission to the date of action taken by the President.

Defendant contends, however, that such an interpretation renders the prohibition of publication phrase a pointless provision. Of course, courts avoid statutory interpretations which would render the statute ineffective. *See FTC v. Manager, Retail Credit Co., Miami Branch Office,* 169 U.S.App.D.C. 271, 515 F.2d 988, 994 (1975). The defendant's argument, however, is premised on a reading of the statute which nowhere finds support in the legislative history. The Board argues that its interpretation "advances the purpose of the Act both by preventing untimely disclosure of matters which could adversely affect our foreign policy or national security and by permitting the President to be able to consider, free from extraneous matters, the foreign policy and national security ramifications of the Board's recommended decision." Def. Mem. at 5. A careful review of the House, Senate and Conference Reports, as well as the debates in both the House and the Senate, yields no support for the proposition that Congress intended the Board decision to remain secret until approved or disap-

proved by the President. The only references to section 801 in the long debate demonstrate only that Congress was concerned with the "manner" of submission to the President. *See* 83 Cong.Rec. 6636 (1938). The full impact of this concern is not provided by the reports or debates, but it can reasonably be inferred that Congress simply intended to afford the President the courtesy of the initial viewing of a decision he would eventually have to act on.[1] Untimely disclosure of foreign policy or national security matters can be prevented by agency classification of portions of its decision pursuant to Section 2(B) of Executive Order 11652,[2] or by an order of non-disclosure pursuant to 49 U.S.C. § 1504.[3] And insulation of the President from outside pressures is, as the Board Chairman recently recognized, more a theoretical argument than a practical reality.[4] In the face of a statute so unambiguously clear, the Court has little choice but to hold that it does not expressly preclude—and in fact expressly permits—publication of a Board decision promptly after its submission to the President.

Two arguments by the Board militating against such a holding require consideration. First, the defendant contends that *Chicago & Southern Airlines v. Waterman S.S. Corp.*, 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948), precludes the interpretation made here. But the *Waterman* Court was not directly presented with an interpretation of section 1461(a), which is at issue here. Rather, the Court had to decide whether section 1006, 49 U.S.C. § 1486 (formerly 49 U.S.C. § 646), authorized judicial review of Presidential actions on Board decisions. The Court held that such review was unavailable, focusing primarily on the competence of the judiciary to review presidential decisions in the area of .foreign affairs. *See* 333 U.S. at 111, 68 S.Ct. at 436, 92 L.Ed. at 576. The Court also held the Board decision unreviewable:

> The statute would hardly have forbidden publication before submission if it had contemplated interposition of the courts at this intermediate stage. Nor could it have expected the courts to stay the President's hand after submission while they deliberate on the inchoate determination. The difficulty is manifest in this case. Review could not be sought until the order was made available, and at that time it had ceased to be merely the Board's tentative decision and had become one finalized by Presidential discretion.

333 U.S. at 112, 68 S.Ct. at 436, 92 L.Ed. at 576. With the exception of the last sentence, the Court's opinion supports the interpretation in the instant case, since the Supreme Court viewed "submission" as the moment when publication was permitted. The last sentence is simply a second repetition of the facts of the *Waterman* case, not a definitive interpretation of the statute. *See* 333 U.S. at 110, 68 S.Ct. at 435, 92 L.Ed. at 575. Having not been presented with the exact question here, the *Waterman*

1. It is difficult to accept the rationale advanced by plaintiff that pre-publication submission would give the President the opportunity to classify portions of the decision. As defendant points out, under plaintiff's interpretation the statute does not require the Board to wait for a classification decision before publication. It only is required to submit the decision before publication.

2. According to one State Department official, "most [section 1461] decisions do not have any significant international implications." Meadows Aff. (II), ¶ 3.

3. *See Administrator, Federal Aviation Administration v. Robertson*, 422 U.S. 255, 95 S.Ct.

2140, 45 L.Ed.2d 164 (1975). This must necessarily limit the scope of injunctive relief to a prohibition of reliance on section 1461 as a basis of nondisclosure.

4. Specifically, Chairman Robson stated:

> The unfortunate experience has been that, despite the legal constraints on release until the President has acted, one way or another, the Board's recommended decision frequently become informally known to the interested parties or the press as soon as they leave the Board. The result has been intense, surreptitious lobbying campaigns in the Executive Branch and Congress.

Pl's Submission to the Court, filed October 9, 1975.

Court's language—itself ambiguous—is not controlling.

▇ Defendant's second argument is based on the long-standing agency interpretation of this provision. It is clear that the Court "when faced with a problem of statutory construction," should show "great deference to the interpretation given the statute by the officers or agency charged with its administration." *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, 625 (1965). Where the statute is clear on its face, however, the Court cannot avoid its duty by submitting to a prior contrary agency interpretation. Moreover, less deference is owing the Board's interpretation here, where the Board interpretation has not been uniform,[5] and where it is presently reconsidering the policy underlying that interpretation. *See* Pl's Submission to the Court, filed October 9, 1975. Therefore, the Court feels no compulsion to defer to the Board's interpretation, and will hold that section 1461(a) does not prohibit disclosure of Board decisions after their submission to the President.

### EXEMPTION 5

▇ The Board argues broadly that its decisions are exempt from disclosure under 5 U.S.C. § 552(b)(5), as "inter-agency and intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." This argument cannot be taken as broadly as it is advanced, since it is clear that the Board decisions *at some time* are required to be published by statute. *See* 49 U.S.C. § 1324(d). In view of the statutory mandate of publication, defendant's argument must be that the decision falls within exemption 5 before Presidential action, but not after. *See* Holland Aff. ¶ 5.

As recently reiterated by the Supreme Court, exemption 5 is intended to protect from disclosure documents which would be privileged within the civil discovery con-

text. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149, 95 S.Ct. 1504, 1516, 44 L.Ed.2d 29, 46 (1975). As in *Sears*, the privilege asserted here is the generally recognized privilege for confidential inter-agency advisory opinions, disclosure of which would be injurious to the consultative functions of government. *Id.* In determining the applicability of the privilege, therefore, this Court must, within the context of this case, look to the privilege's underlying policy of protecting the decision making processes of government agencies, determine whether publication prior to Presidential action would inhibit "the frank discussion of legal and policy matters" within the agency, or would otherwise cause "injury to the quality of agency decisions." 421 U.S. at 150–51, 95 S.Ct. at 1516, 44 L.Ed.2d at 47.

▇ Plaintiff argues at length that Board decisions are in fact "final opinions" within the meaning of 5 U.S.C. § 552(a)(2) and therefore subject to prompt disclosure. *See Sears, supra*, at 153–54, 95 S.Ct. at 1516, 44 L.Ed.2d at 47. The Court need not decide this difficult question, since even if not final opinions, it is clear that disclosure of Board decisions prior to Presidential action will not cause "injury to the quality of agency decisions," and as a result the privilege is inapplicable.

▇ The case presented is peculiar among exemption 5 cases, for usually the agency attempts to bar disclosure at any time. Here, however, the statute requires disclosure, the only question being whether the disclosure can be prior to Presidential action. It is undisputed that Board members anticipate publication of their decision after Presidential action. It cannot logically be argued that the views expressed would be any less frank or candid if publication occurred prior to Presidential action. Nor can it be argued that the Presidential action would be inhibited or injured, since the President is aware that the material placed before him by the Board will shortly be published, thereby disclosing at least

---

**5.** Prior to 1950, the CAB had interpreted the statute to preclude publication of the Board decision, even after Presidential action. *See* Holland Aff. ¶ 3.

part of the foundation upon which the deliberative process took place. Other than the pre-action pressures which inevitably would occur—and which in fact concededly occur now—pre-action publication will have no effect on the Presidential approval process. As was stated earlier, disclosure of material in the decisions which would be harmful to the foreign policy or national security of the United States can be prevented by classification pursuant to Executive Order 11652. Exemption 5, therefore, is inapplicable.

In light of the foregoing, it is this 10th day of May, 1976, without a hearing pursuant to Local Rule 1–9(f),

ORDERED that plaintiff's motion for summary judgment be and the same hereby is granted; and it is further

ORDERED that defendant's motion for summary judgment be and the same hereby is denied; and it is further

ORDERED that defendant Civil Aeronautics Board be and hereby is enjoined from withholding from public inspection and copying all future decisions or portions of future decisions made by defendant pursuant to 49 U.S.C. § 1461, at any time immediately after those decisions are physically transmitted to the President, unless the withholding is validly premised on a statutory provision or Executive Order other than 49 U.S.C. § 1461(a).