581 F.2d 846
 189 U.S.App.D.C. 68
 BRANIFF AIRWAYS, INC., a corporation, Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent*,
American Airlines, Inc., Intervenor.
CONTINENTAL AIR LINES, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent,
American Airlines, Inc., United States of America, Delta Air
Lines, Inc., City of Kansas City, Missouri and
Chamber of Commerce of Greater Kansas
City, Intervenors.
ALLEGHENY AIRLINES, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent,
American Airlines, Inc. and Delta Air Lines, Inc., Intervenors.
TRANS WORLD AIRLINES, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent,
American Airlines, Inc., Delta Air Lines, Inc. and City of
Kansas City, Missouri, et al., Intervenors.
OZARK AIR LINES, INC., a corporation, Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent,
Delta Air Lines, Inc. and American Airlines, Inc., Intervenors.
 Nos. 76-2043, 76-2176, 77-1020, 77-1027 and 77-1166.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 13, 1978.
Decided July 10, 1978.
 
 Lee M. Hydeman, Washington, D. C., argued for the petitioners Braniff Airways, Inc., in case No. 76-2043, Continental Air Lines, Inc., in case No. 76-2176, Trans World Airlines, Inc., in case No. 77-1027, and Ozark Air Lines, Inc., in case No. 77-1166.
 O. D. Ozment, Washington, D. C., argued for the petitioner Allegheny Airlines, Inc., in case No. 77-1020.
 B. Howell Hill, Washington, D. C., was on the brief for petitioner Braniff Airways, Inc.
 Thomas J. McGrew, Washington, D. C., also entered an appearance for petitioner Braniff Airways, Inc., in case No. 76-2043.
 Thomas D. Finney, Jr., Washington, D. C., with whom Lee M. Hydeman and James T. Lloyd, Washington, D. C., were on the brief, for petitioner Continental Air Lines, Inc.
 Edmund E. Harvey, Washington, D. C., and Henry J. Oechler, Jr., New York City, were on the brief for petitioner Trans World Airlines, Inc.
 Paul L. Bradshaw, Springfield, Mo., also entered an appearance for petitioner Ozark Air Lines, Inc. in No. 77-1166.
 Theodore I. Seamon, Washington, D. C., with whom O. D. Ozment, Washington, D. C., was on the brief, for petitioner Allegheny Airlines, Inc.
 David B. Armstrong, Washington, D. C., also entered an appearance for petitioner Allegheny Airlines, Inc.
 Jay L. Witkin, Washington, D. C., with whom James C. Schultz, Gen. Counsel, Jerome Nelson, Deputy Gen. Counsel, Glen M. Bendixsen, Associate Gen. Counsel, and Robert L. Toomey, Atty., Washington, D. C., were on the brief, for respondent.
 
 
 1
 Robert B. Nicholson and Susan J. Atkinson, Attys., Dept. of Justice, Washington, D. C., were on the brief for intervenor United States of America.
 
 
 2
 Daniel J. Conway, Barry Grossman, and Frederic Freilicher, Washington, D. C., also entered appearances for the Dept. of Justice.
 
 
 3
 Alfred V. J. Prather and Ky P. Ewing, Jr., Washington, D. C., were on the brief for intervenor American Airlines, Inc.
 
 
 4
 J. William Doolittle, Washington, D. C., argued the judiciary issues and entered an appearance for intervenor American Airlines, Inc.
 
 
 5
 James W. Callison, Atlanta, Ga., also entered an appearance for intervenor Delta Air Lines, Inc.
 
 
 6
 Nordahl E. Holte, Kansas City, Mo., also entered an appearance for intervenor City of Kansas City, Missouri, et al.
 
 
 7
 Before WRIGHT, Chief Judge, and TAMM and LEVENTHAL, Circuit Judges.
 
 
 8
 Opinion for the court filed by Circuit Judge TAMM.
 
 TAMM, Circuit Judge:
 
 9
 Petitioners[1] seek review, under 49 U.S.C. § 1486(a) (1970), of an order of the Civil Aeronautics Board (the Board) awarding intervenor American Airlines authority to operate between Chicago and Montreal. Because of the international nature of this route, the order was submitted to, and approved by, the President prior to its being served. Id. § 1461(a) (Supp. V 1975). American has moved to dismiss the petitions for review on the authority of Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948). Because the nature of petitioners' challenges to the Board's order brings this case squarely within the holding of Waterman, we hold that the Board's order is nonreviewable, and thus grant the motion to dismiss.
 
 
 10
 * On May 8, 1974, the United States and Canada entered into an amendment to their bilateral Air Transport Agreement.[2] The amendment provided for a number of new routes for the air carriers of each country, Canada agreeing, Inter alia, that a United States carrier would have the right to operate between Chicago and Montreal beginning April 25, 1976.
 
 
 11
 On June 11, 1975, the Board instituted the Chicago-Montreal Route Proceeding to consider the need for United States air carrier service between these two cities, and, if such a need existed, to determine which carrier or carriers should be authorized to provide the service.[3] An administrative law judge (ALJ) found that the public interest required the designation of a U.S.-flag carrier to inaugurate service on the Chicago-Montreal route, and he recommended that Trans World Airlines be selected to provide the service.[4] On review, the Board affirmed the ALJ's finding of a need for U.S.-flag service in the market, but it instead chose American to operate the Chicago-Montreal route.[5]
 
 
 12
 Because the route under consideration would involve "overseas or foreign air transportation," the Board's proposed decision was transmitted to the President, pursuant to section 801 of the Federal Aviation Act of 1958, as amended, 49 U.S.C. § 1461(a) (Supp. V 1975). On November 4, 1976, President Ford approved the Board's order, noting in his letter of approval that:
 
 
 13
 The issues presented in this proceeding are not affected by any substantial defense or foreign policy considerations, and no defense or foreign policy considerations underlie my decision.[6]
 
 
 14
 The Board's order was served on November 8, 1976, to be effective on January 7, 1977.[7] On January 6, 1977, the Board issued a second order, which denied requests for reconsideration and refused to stay the original order.[8] This appeal ensued.
 
 II
 
 15
 In Waterman, the Supreme Court interpreted what is now section 1006 of the Federal Aviation Act[9] to preclude judicial review of orders, granting or denying international air route authority to citizen carriers, that must be submitted to the President for approval under section 801 of the Act.[10] 333 U.S. at 114, 68 S.Ct. 431. Since precisely that type of order is now before us, and since the thirty-year-old Waterman doctrine has not been overturned by the Court[11] or the Congress,[12] the doctrine of Stare decisis would appear to render unnecessary any further discussion in this case. However, certain contentions advanced by the petitioners require further analysis.
 
 
 16
 Petitioners first point out that the 5-4 decision in Waterman has been criticized virtually since its issuance.[13] A fair measure of the criticism has been directed at the expansive language used to describe presidential prerogatives in the conduct of foreign affairs, and, indeed, the Supreme Court has subsequently emphasized, in an oblique reference to Waterman, that not all questions touching upon foreign relations lie beyond judicial cognizance. Baker v. Carr, 369 U.S. 186, 211-13, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); See Zweibon v. Mitchell, 170 U.S.App.D.C. 1, 29-30, 516 F.2d 594, 622-23 (1975) (en banc) (principal opinion) (Wright, J.), Cert. denied, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976).
 
 
 17
 Secondly, Waterman has often been limited and distinguished, most notably in cases decided by this court. In American Airlines, Inc. v. CAB, 121 U.S.App.D.C. 120, 348 F.2d 349 (1965), which questioned the Board's authority to permit supplemental carriers to engage in "split charter" flights to foreign countries, then-Judge Burger stated that the Waterman doctrine did not preclude judicial review of challenges asserting that the Board had acted outside its statutory authority regarding domestic carriers applying for international routes. Id. at 123, 348 F.2d at 352; See Pan American World Airways, Inc. v. CAB, 129 U.S.App.D.C. 159, 168-169, 392 F.2d 483, 492-93 & nn. 11 & 13-15 (1968). However, he also noted specifically that the Waterman bar to judicial review Did apply to challenges attacking the substantiality of evidence undergirding presidentially approved Board orders, and challenges alleging procedural due process deficiencies in the proceedings leading to the order. American Airlines, Inc. v. CAB, 121 U.S.App.D.C. at 123, 348 F.2d at 352; See Pan American World Airways, Inc. v. CAB, 129 U.S.App.D.C. at 169, 172 n. 26, 392 F.2d at 493, 496 n. 26. See also British Overseas Airways Corp. v. CAB 113 U.S.App.D.C. 76, 304 F.2d 952, 953, (1962); United States Overseas Airlines, Inc. v. CAB, 95 U.S.App.D.C. 363, 222 F.2d 303, 304 (1955).[14] Echoing Waterman, Judge Burger supported this latter statement by noting that "the President must be free to consider broad 'evidentiary' policy factors not involved, and indeed not relevant, in Board proceedings and that the President must be free to exercise unreviewable discretion as to the weight to be given to such extrajudicial factors." American Airlines, Inc. v. CAB, 121 U.S.App.D.C. at 123, 348 F.2d at 352. See also Pan American-Grace Airways, Inc. v. CAB, 119 U.S.App.D.C. 326, 342 F.2d 905, 909-10 (1964) (Wright, J., concurring), Cert. denied, 380 U.S. 934, 85 S.Ct. 941, 13 L.Ed.2d 821 (1965).
 
 
 18
 Since, in the instant appeal, petitioners do not advance any challenge to the Board's authority, but rather present a typically detailed challenge to the merits of the Board's decision, judicial review of the order granting international air route authority, approved by the President, appears to be expressly precluded by the Waterman holding. Petitioners, however, joined by the United States of America as intervenor, argue that this case is distinguishable from Waterman because of the President's statement in his approval of the Board's order that "no defense or foreign policy considerations underlie my decision."[15] Briefly put, their contention is that this statement removes any impediment to judicial review arising from application of the Waterman doctrine, since that doctrine applies only to "final orders (that) embody Presidential discretion as to political matters beyond the competence of the courts to adjudicate," 333 U.S. at 114, 68 S.Ct. at 437.
 
 
 19
 The President's statement derives from Executive Order No. 11,920, 3 C.F.R. 121 (1977), which establishes executive branch procedures to facilitate presidential review of Board decisions submitted under 49 U.S.C. § 1461. Specifically, agencies are required to forward to the White House reports that "identify with particularity the defense or foreign policy implications," if any, of the Board decision under review, in order that the President might consider including in his letter of approval a disclaimer such as is presented here. 3 C.F.R. at 122. Insertion of such a disclaimer is "(f)or the purpose of assuring whatever opportunity is available under the law for judicial review." Id. at 123.
 
 
 20
 The executive order apparently was issued in response to growing criticism of the manner in which international route decisions were reviewed in the Executive Office of the President. Principally, critics charged that economic and political considerations of a domestic nature, often advanced in ex parte communications with members of the White House staff, had supplanted national defense and foreign policy considerations as the dominant factors in most route selection approvals, and yet application of the Waterman doctrine insulated the former considerations from any form of judicial review.[16]
 
 
 21
 While this court's commitment to integrity in the administrative decisionmaking process is unwavering,[17] we cannot endorse a remedial measure, no matter how well intentioned, that fails to give due consideration to basic constitutional principles. The procedure established in this executive order attempts to give the President power to decide which Board orders are subject to judicial review. The President, however, cannot create judicial review authority. American Airlines, Inc. v. CAB, 121 U.S.App.D.C. at 122, 348 F.2d at 351; Accord, Ludecke v. Watkins, 335 U.S. 160, 166, 68 S.Ct. 1429, 92 L.Ed. 1881 (1948); See Hayburn's Case, 2 U.S. 409, 411-12, 2 Dall. 409, 410-13, 1 L.Ed. 436 (1792). As recently reemphasized by Mr. Justice Marshall in an analogous setting,[18] "the task of defining the role of the Judiciary is for this Court, and not the Executive Branch." Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682, 725, 96 S.Ct. 1854, 48 L.Ed.2d 201 (1976) (Marshall, J., dissenting). If we were to permit the President to determine the appropriateness of judicial review, we would abdicate our constitutional function, and contribute to politicization of the Judiciary. See First National City Bank v. Banco Nacional de Cuba, 406 U.S. 759, 790, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972) (Brennan, J., dissenting). Further, because any judicial decision on the merits that resulted in a remand to the Board for further proceedings would, in course, be presented once again to the President for approval, the initial decision by the court of appeals would be impermissibly advisory in nature. Hayburn's Case, 2 U.S. at 411, 2 Dall. at 411, 1 L.Ed. 436; Accord, McGrath v. Kristensen, 340 U.S. 162, 167-68 & n. 6, 71 S.Ct. 224, 95 L.Ed. 173 (1950); See Glidden Co. v. Zdanok, 370 U.S. 530, 582, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962) (principal opinion) (Harlan, J.).[19]
 
 
 22
 The procedure is rendered even more troublesome by the following statement from the fact sheet issued with the executive order by the White House Press Secretary:
 
 
 23
 In a case involving a "routine" approval of an order with respect to a foreign or overseas certificate of a U.S. carrier, i. e., one not based on any foreign policy or defense objectives, the President May indicate that he would have no objection to judicial review of the CAB decision and proceeding.
 
 
 24
 Joint Appendix at 961, 962 (emphasis added). Thus, because he is not required to include a disclaimer in all cases not involving foreign policy considerations, the President has not bound himself to adhere to the spirit of the procedure. As a result, whatever potential now exists for political abuse of the Waterman doctrine would appear to remain.
 
 
 25
 Similarly, we express some degree of skepticism concerning whether the award of an international air route could ever be entirely free of foreign policy and defense considerations. Indeed, after stating in his letter of approval that such considerations were not present in this case, President Ford continued:
 
 
 26
 I note that by the terms of the May 8, 1974, air services agreement with Canada, United States flag service in the Chicago-Montreal market could have begun on April 25, 1976. Yet the Board did not complete its carrier selection until this month.
 
 
 27
 The United States' public interests are not served when foreign governments gain valuable traffic rights for their carriers in exchange for rights for United States carriers that either are not operated or are uneconomic. I appreciate the Board's responsibility to weigh the public service and economic viability considerations in its proceedings. At the same time, the public deserves the benefits that warranted new routes can provide, and United States carriers deserve timely hearing of their route applications.
 
 
 28
 Foreign governments evidence no reluctance to designate their carriers to serve new routes. As a result, foreign carriers often enjoy negotiated route benefits before United States carriers, even though our international agreements are drawn to provide a balance of competitive opportunity.
 
 
 29
 Accordingly, I request that the Board act promptly on the further route cases implementing the May 8, 1974, agreement with Canada.
 
 
 30
 Id. at 50.
 
 
 31
 Implicit in these sentiments is the notion that general foreign policy considerations, including balance of both payments and competitive opportunity, are at play to at least some degree during each of the stages leading to the ultimate award: negotiations with the foreign country; proceedings before the Board; and consideration by the President. A variation of this theme was echoed by President Carter in a letter to the Board Chairman, dated April 22, 1977, concerning cargo rate proposals by domestic and foreign carriers:
 
 
 32
 As you know, one of this Administration's key objectives in the field of aviation is the encouragement of price competition among carriers, a policy which will yield substantial benefit to consumers. While special circumstances sometimes exist with respect to the international aviation environment, encouraging such competition is also an important element of our foreign economic policy.
 
 
 33
 Id. at 968; See Washington Post, May 22, 1978, § D, at 10, col. 6.
 
 
 34
 Finally, one must not lose sight of the fact that the President's special authority in the award of international air routes is "exercised pursuant to statute; i. e. by the will of Congress," United States v. American Telephone & Telegraph Co., 179 U.S.App.D.C. 198, 551 F.2d 384, 392 (1976). Thus, even though the President may believe that no defense or foreign policy considerations are present, the Congress may have exactly the opposite view.
 
 III
 
 35
 We hold, therefore, that because these petitions challenge only the merits of the decision underlying the order of the Board that was approved by the President, and not the Board's authority to issue such an order, judicial review is precluded by application of the Waterman Doctrine.[20] The motion to dismiss is granted, and the petitions for review are dismissed.
 
 
 36
 So ordered.
 
 
 
 *
 In order to distinguish this case from others of the same name, readers are encouraged to cite it as: Braniff Airways, Inc. v. CAB (Chicago-Montreal)
 
 
 [1]
 Braniff Airways, Inc.; Continental Air Lines, Inc.; Allegheny Airlines, Inc.; Trans World Airlines, Inc.; and Ozark Air Lines, Inc
 
 
 [2]
 Agreement Amending Air Transport Agreement, May 8, 1974, United States-Canada, 25 U.S.T. 748, T.I.A.S. No. 7824; See Air Transport Agreement, Jan. 17, 1966, United States-Canada, 17 U.S.T. 201, T.I.A.S. No. 5972. For a discussion of how such agreements are negotiated, see Calkins, The Role of the Civil Aeronautics Board in the Grant of Operating Rights in Foreign Air Carriage, 22 J.Air L. & Com. 253 (1955). See also Brief of American Airlines, Inc. at 4-5
 
 
 [3]
 CAB Order 75-6-55, Docket 27932, Joint Appendix (J.A.) at 18, 21
 
 
 [4]
 Recommended Decision of Administrative Law Judge Frank M. Whiting, Docket 27932, Feb. 27, 1976, J.A. at 108, 130, 149
 
 
 [5]
 Chicago-Montreal Route Proceeding, (1976) 2 Av.L.Rep. (CCH) P 22,224
 
 
 [6]
 J.A. at 50
 
 
 [7]
 Id. at 30, 47
 
 
 [8]
 Id. at 51, 70
 
 
 [9]
 49 U.S.C. § 1486(a) (1970), formerly 49 U.S.C. § 646(a) (1952), provides (emphasis added):
 Any order, affirmative or negative, issued by the Board or Administrator under this chapter, Except any order in respect of any foreign air carrier subject to the approval of the President as provided in section 1461 of this title, shall be subject to review by the courts of appeals of the United States or the United States Court of Appeals for the District of Columbia upon petition, filed within sixty days after the entry of such order, by any person disclosing a substantial interest in such order. After the expiration of said sixty days a petition may be filed only by leave of court upon a showing of reasonable grounds for failure to file the petition theretofore.
 
 
 [10]
 Section 801(a) of the Act, as amended, 49 U.S.C. § 1461(a) (Supp. V 1975), provides:
 The issuance, denial, transfer, amendment, cancellation, suspension, or revocation of, and the terms, conditions, and limitations contained in, any certificate authorizing an air carrier to engage in overseas or foreign air transportation, or air transportation between places in the same Territory or possession, or any permit issuable to any foreign air carrier under section 1372 of this title, shall be subject to the approval of the President. Copies of all applications in respect of such certificates and permits shall be transmitted to the President by the Board before hearing thereon, and all decisions thereon by the Board shall be submitted to the President before publication thereof.
 
 
 [11]
 Indeed, Waterman has been cited by the Court as recently as 1974. United States v. Nixon, 418 U.S. 683, 710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); California Bankers Ass'n v. Schultz, 416 U.S. 21, 59, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974). See also Pan American World Airways, Inc. v. United States, 371 U.S. 296, 310, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963); Puget Sound Traffic Ass'n v. CAB, 175 U.S.App.D.C. 410, 412, 536 F.2d 437, 439 (1976)
 
 
 [12]
 There have been many congressional attempts to limit or overrule Waterman, but to date none has been successful. In 1957, the Senate passed a bill that sought to limit Waterman so as to permit judicial review of all elements of international route decisions except those elements specifically grounded upon national defense or foreign policy bases; the House of Representatives did not act on the bill. S.1423, 85th Cong., 1st Sess. (1957); See S.Rep.No. 119, 85th Cong., 1st Sess. 1-5 (1957); 103 Cong.Rec. 5137 (1957). In 1972, however, an amendment to section 801 of the Federal Aviation Act was enacted, adding a new subsection to that provision. See Pub.L. No. 92-259, § 2, 86 Stat. 95, 96 (1972). The new subsection, 49 U.S.C. § 1461(b) (Supp. V 1975), provides that the President may disapprove certain actions regarding rates, fares, and charges in "foreign transportation" only for reasons of national defense or foreign policy; this amendment left untouched the original language of section 801, the statutory basis for Waterman. In 1977, two bills affecting section 801, S.292 and S.689, were introduced, the latter proposing a repeal of section 801 in its entirety; neither bill was passed by the Senate. See S.689, 95th Cong., 1st Sess. § 20 (1977); Hearings on S.292 & S.689 Before the Subcomm. on Aviation of the Senate Comm. on Commerce, Science & Transportation, 95th Cong., 1st Sess. (1977). In early 1978, the sponsors of S.689 introduced a new bill, which passed the Senate on April 19, 1978. S.2493, 95th Cong., 2d Sess. (1978); See 124 Cong.Rec. S5900 (daily ed. Apr. 19, 1978). Significantly, this most current bill does not affect section 801 in any fashion
 
 
 [13]
 See Brief for Petitioner Braniff Airways, Inc. at 22-25; Miller, The Waterman Doctrine Revisted,, 54 Geo.L.J. 5 (1965); Hochman, Judicial Review of Administrative Processes in Which the President Participates, 74 Harv.L.Rev. 684 (1961)
 
 
 [14]
 Commentators generally have agreed with the distinction drawn by the American Airlines case, although some have indicated that perhaps procedural due process claims should also be subject to judicial review. See, e. g., Miller, Supra Note 13, at 22
 
 
 [15]
 See note 6 Supra, and accompanying text. The Board has expressed no view on this contention. See Brief for Respondent at 15-16 n. 19
 
 
 [16]
 Whitney, Integrity of Agency Judicial Process Under the Federal Aviation Act: The Special Problem Posed by International Airline Route Awards, 14 Wm. & Mary L.Rev. 787, 796-801 & n. 62 (1973); Note, Section 801 of the Federal Aviation Act The President & the Award of International Air Routes to Domestic Carriers: A Proposal for Change, 45 N.Y.U.L.Rev. 517, 523, 527-33 (1970); See Aviation Consumer Action Project v. CAB, 412 F.Supp. 1028, 1031 & n. 4 (D.D.C.1976)
 
 
 [17]
 We have previously noted the obvious contribution toward this goal of other provisions of Executive Order No. 11,920, which should mollify, to a considerable degree, those critics concerned about improper ex parte communications:
 Sec. 4. Individuals within the Executive Office of the President shall follow a policy of (a) refusing to discuss matters relating to the disposition of a case subject to the approval of the President under section 801 with any interested private party, or an attorney or agent for any such party, prior to the President's decision, and (b) referring any written communication from an interested private party, or an attorney or agent for any such party, to the appropriate department or agency outside of the Executive Office of the President. Exceptions to this policy may only be made when the head of an appropriate department or agency outside of the Executive Office of the President personally finds that direct written or oral communication between a private party and a person within the Executive Office of the President is needed for reasons of defense or foreign policy.
 Sec. 5. Departments and agencies outside of the Executive Office of the President which regularly make recommendations to the President in connection with the Presidential review pursuant to section 801 shall . . .
 (a) establish public dockets for all written communications (other than those requiring confidential treatment for defense or foreign policy reasons) between their officers and employees and private parties in connection with the preparation of such recommendations; and
 (b) prescribe such other procedures governing oral and written communications as they deem appropriate.
 
 
 [3]
 C.F.R. 121, 123 (1977); See Home Box Office, Inc. v. FCC, 185 U.S.App.D.C. ----, 567 F.2d 9, 56-57 (per curiam), Cert. denied, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977)
 
 
 [18]
 In his dissenting opinion in Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682, 724-25, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976), Justice Marshall called attention to the fact that the applicability of the so-called Bernstein exception to the act of state doctrine, a doctrine that immunizes foreign governments from suits based on public acts performed in their own territory, had been rejected by six members of the Court in First Nat'l City Bank v. Banco Nacional de Cuba, 406 U.S. 759, 772-73, 776-77, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972). The Bernstein exception, which stems from the case of Bernstein v. N.V. Nederlandsche-Amerikaansche Stoomvaart-Maatschappij, 210 F.2d 375 (2d Cir. 1954) (per curiam), would allow the Executive to advise a court whether declining to apply the act of state doctrine in a particular case would adversely affect the conduct of foreign policy. If no such adverse effect or embarrassment would result, the theory goes, then the court would be free to review the case
 
 
 [19]
 But see Hochman, Supra note 13, at 706-07 & n. 76; 3 K. Davis, Administrative Law Treatise § 20.05, at 84-85 (1958)
 
 
 [20]
 Although American's pleading was styled as a motion to dismiss for lack of jurisdiction, we base our holding on the fact that the orders are nonreviewable. See Barlow v. Collins, 397 U.S. 159, 171 n. 3, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970)